## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BILLINGNETWORK PATENT, INC.,

              **Plaintiff,**                    Case No.: 8:04-CV-1515-T-27MAP

vs.

CERNER PHYSICIAN PRACTICE, INC. and
VITALWORKS, INC.,

              **Defendants.**

_____/

## ORDER

**BEFORE THE COURT** is Plaintiff's Opening Claim Construction Brief (Dkt. 64),

Defendants' Claim Construction Brief (Dkt. 68), Plaintiff's Reply Brief in Support of Plaintiff's

Opening Claim Construction Brief (Dkt. 72), and the parties' Joint Claim Construction Statement

(Dkt. 86).  A claims construction (*Markman)* hearing was conducted on December 2, 2005.  After

consideration, Plaintiff's request for claim construction (Dkt. 64) is **GRANTED IN PART**.

### I. Background

Plaintiff asserts that it is the assignee of U.S. Patent No. 6,374,229 (the "'229 Patent")

entitled "Integrated Internet Facilitated Billing, Data Processing and Communication System." (Dkt.

25 at ¶ 8).  Plaintiff's system is essentially an internet based billing system intended for primary use

by the medical industry.  In this action, Plaintiff alleges that Defendants infringed Claim 1 of its '229

patent.[1]  (Dkt. 25 at ¶ 10).  The '229 patent specification describes BillingNetwork's  electronic

billing system in which subscribers access an internet database through either direct access (thin

---

[1] Defendants' Motion to Strike references to Claims 6 and 7 was granted.  (*See* Dkt. 81).

client technology and the Citrix® server) or a browser-based system. ('229 patent, col. 1, ll. 8-9, col. 2, ll. 56-59). Only the browser-based subscriber system is at issue.

In the browser-based system, the subscriber logs into secured sites via an internet home page. (*Id.*, col. 3, ll. 51-54). The subscriber inputs data such as the company billed, the amount billed and billing address of the company into forms, which are submitted to the database server. (*Id.*, col. 3, l. 66- col. 4, l. 2; col. 3, ll. 58-61). The database server produces invoices to clients and customers. (*Id.*, col. 2, ll. 59-63). Subscribers are also able to submit query forms to the database server to retrieve saved information. (*Id.*, col. 4, ll. 7-13). This information is sent from the database server to the subscriber terminal. (*Id.*, col. 5, ll. 26-28). The advantage of the system compared to prior art is the ability of subscribers to access a high powered database server without the need to purchase new computer equipment, new software or hire additional personnel. (*Id.*, col. 2, ll. 42-46).

## II. Legal Framework for Claims Construction

The court is charged with the task of construing a patent, including terms of art within a claim. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Claim terms are generally given their ordinary and customary meaning, absent an express intent to impart a novel meaning to the term. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The ordinary meaning is "its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321. At times, the ordinary meaning may be readily apparent and general purpose dictionaries will be helpful in defining those terms. *Id.* at 1314. However, when terms have a particular meaning in a field of art, three sources of intrinsic evidence are considered, the claim, the patent specification, and the patent's prosecution history. *Id.; Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)(en banc), *aff'd*, 517 U.S. 370, 372, 116 S. Ct. 1384, 134 L.Ed.2d 577 (1996). These

2

three sources of intrinsic evidence are "the most significant source of the legally operative meaning of the disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In construing claim terms, the entire written instrument, including the patent specification, should be considered in the determination of whether a special definition has been given to a term. *Phillips,* 415 F.3d at 1315-16.  The specification contains a description of the invention and "[f]or claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claim."  *Markman,* 52 F.3d at 979. Often, the specification "is the single best guide to the meaning of a disputed term." *Vitronics Corp.,* 90 F.3d at 1582.  Claims "must be read in view of the specification, of which they are part" and "usually", the specification is "dispositive" as to the claim construction analysis. *Phillips,* 415 F.3d at 1315. The specification is required to describe the claimed invention in "full, clear, concise and exact terms."  35 U.S.C. § 112, ¶ 1.  There is a distinction, however, between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim. *Phillips,* 415 F.3d at 1323; *Burke, Inc. v. Bruno Indep. Living Aids, Inc,* 183 F.3d 1334, 1340 (Fed. Cir. 1999).

The patent's prosecution history may also be considered as it provides evidence of how the inventor understood the patent. *Phillips,* 415 F.3d at 1317.  The prosecution history contains the record of the proceedings before the Patent and Trademark Officer "including any express representations made by the applicant regarding the scope of the claims." *Teleflex, Inc,* 299 F.3d at 1328.

Finally,  extrinsic evidence may be considered in order to assist in discerning the "true

meaning" of the language used in the patent claim. *Phillips,* 415 F.3d at 1314, 1319; *Markman,* 52 F.3d at 980. Extrinsic evidence, however, may not be used to vary or contradict the terms of the claims. *Markman,* 52 F.3d at 981; *See Vitronics Corp.*, 90 F.3d at 1583-85. Extrinsic evidence should only be considered when the intrinsic evidence is insufficient to allow a determination of the meaning of the claims. *Vitronics Corp.*, 90 F.3d at 1583-85.

### III. Claims Construction of Disputed Terms

Claim 1 provides:

1.     An integrated internet facilitated billing, data processing, and communication system comprising:

> *a database server* and a *home page* of a website which provides access via an internet service provider (ISP) to said database server by a plurality of *browser-based subscribers* each of which have *electronic access* to said *home page* via a modem and the ISP;
> said *home page* providing only *secure access* by each *browser-based subscriber* to one of a plurality of *subscriber areas* within said system;
> *means for providing electronic transfer of substantially only billing and data entry forms to the browser-based subscriber upon request, data entered on said forms, when electronically returned to a corresponding said subscriber area, then entered into said database server, said database server then, utilizing an appropriate application software thereon, producing billing invoices and statements to clients and customers for each corresponding browser-based subscriber*;
> *means for providing real time electronic viewing and query access of data and billings stored in said database server by each corresponding browser-based subscriber,*
> a PC type computer electronically connected to said *database server* for *controlling said forms* as required and *responding to queries* entered by each *browser-based subscriber.*

### A. *"database server"*

The ordinary meaning of the term "database server" is readily apparent and general purpose dictionaries are helpful references. Notwithstanding the somewhat contentious arguments, the parties

4

have not shown that "database server" has any particular meaning in the field of art. The dictionary definitions relied on by the parties include the common characteristics of a computer device or component which provides storage of and access to shared data in what is commonly known as a shared database.

Plaintiff argues that the term "database server" should be construed as "a computer *system* on a network that stores a shared database and enables network users to retrieve the data they request." (Dkt. 86 at Ex.1, p.2)(emphasis added). Plaintiff's definition is too broad, however, considering the plain language of the claim. The claim identifies the "database server" as a *component* of the "integrated internet facilitated billing, data processing, and communication system." ('229 patent, col. 5, ll. 53-55). The specification likewise describes the component nature of the database server. The specification implicitly limits the broad dictionary definition proposed by Plaintiff. *See Phillips,* 415 F.3d at 1321.

Defendants contend that "database server" should be construed as "a device dedicated to storing and providing access to data and forms," relying on the specification and the Microsoft Computer Dictionary 123 (4th Ed. 1999). (Dkt. 86 at Ex. 2, p. 1). The Court agrees that this definition, with some adaptation based on the plain language of the claim, more accurately defines the "database server" depicted in Plaintiff's invention. The Court finds that a person skilled in the art would understand "database server" to mean "network device dedicated to storing and providing access to a shared database, including data and forms."

The plain language of claim 1 and the specification support this construction. Browser-based subscribers gain access to the database server, labeled "32" in Figure 1 of the '229 patent, through the home page of a website via an internet service provider ("ISP"). ('229 patent, col. 5, ll. 55-58).

5

Data entered on forms is entered into the database server, which utilizes software to produce billing

invoices and statements to clients and customers of subscribers. (*Id.*, col. 5, l. 65- col. 6, l. 4).

The specification explains that the subscriber enters data into the forms which are then

entered into the database server:

> "Forms are completed and transferred from the corresponding subscriber area
> for forwarding into a database server which is of the open database compliant type
> (ODBC)." (*Id.*, col. 3, ll. 58-60). "Data entered via forms processing is transferred
> into the database server which utilizes appropriate application software therein to
> produce billing invoices and statements to clients and customers of each
> corresponding browser-based subscriber." (*Id.*, col. 2, ll. 59-63).

The specification also indicates that subscribers can access information stored in the database server:

> "These query forms provide each subscriber with access to the database
> server which, in combination with drop-down lists, select the desired account for
> access to the database of the data server 32 to retrieve the requested information to
> the screen of the remote PC." (*Id.*, col. 4, ll. 9-13).

Subscribers can also access forms from the database server. The specification provides that forms

are transferred into the database server from Billingnetwork PCs:

> "Input and query forms are developed within the system 11 by billing network PC
> work stations 38 which are connected at hub 36, all forms and information input
> being subject to business rules and logic at 34 before entered into the database server
> 32." (*Id.*, col 4, ll. 13-18).

Next, the specification provides that "[o]nce into the particular browser-based subscriber

area 80 within the system 71, each browser-based subscriber 72 will have access to one of several

customized forms that they will complete electronically at their work station and transfer to the

database server 90. Form development and customization will be done within the system at internal

work stations 106 by employees of the system." (*Id.*, col. 5, ll. 12-18). Figure 1 shows that the

forms must pass through the database server to reach the subscriber areas. As Plaintiff and

6

Defendants suggest by their proposed constructions, the database server stores information and provides access to the database and to the forms.

Plaintiff describes the server as a "computer system on a network," based on the cited dictionary definition. However, the '229 patent specification refers to the "browser-based subscriber *system*" as encompassing the subscriber PC, homepage, subscriber areas, database server and Billingnetwork PCs, among other components. (*Id.* at Fig. 1)(emphasis added). Accordingly, the Court finds that the term "system" is inconsistent with the patent specification, as the database server is not a "system."

Defendants' use of the word "device" stems from their cited definition of a database server as "[a] network *node*, or station, dedicated to storing and providing access to a shared database." (See Dkt. 68 at Ex. B)(emphasis added). As the database server is but one component of the described "system," the Court finds that the term "device" is consistent with the patent specification, utilizing the definitions in the Microsoft Computer Dictionary (Dkt. 68, Ex. B).[2]   Further, in accordance with both parties' suggested constructions and the specification descriptions, the purpose of this device is to store a database and provide access to the database and to forms. Accordingly, the Court construes the term "database server" to mean "network device dedicated to storing and providing access to a shared database, including data and forms." .

B. *"home page"*

Plaintiff argues that the term "home page" should be construed as "the first screen containing information you see when you arrive at a website," relying on the Dictionary of Computer and

---

[2] That dictionary defines a "database server" as a "network node." "Node" is defined as a "device."

Internet Words and the Shames Declaration. (Dkt. 86 at Ex. 1, p. 3). Defendants argue that the term "home page of a website" should be construed as "[t]he entry page for a set of related HyperText Markup Language (HTML) documents on the World Wide Web." (Dkt. 86 at Ex. 2, p. 1). Defendants cite to the '229 patent specification, the Microsoft Computer Dictionary and *Resonate, Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1361-62 (Fed. Cir. 2003)(providing that "[e]very web page has a home page, which is identified by a URL and is the first document users see when they first connect to the web site").

It is unnecessary to construe the commonly understood term "website". It is only necessary to construe the term "home page." A person skilled in the art would understand "homepage" of a website to mean "entry page" of a website.

The plain language of Claim 1 states that browser-based subscribers have electronic access to a home page which provides access via an ISP to a database server. ('229 patent, col. 5, ll. 55-59). This home page provides only secure access to subscriber areas. (*Id.*, col. 5, ll. 60-62). The specification reiterates that "[e]ach of the subscribers 12 and 20 *enter the system* 11 via a home page 18 of a website of the system 11." (*Id.*, col. 3, ll. 51-52)(emphasis added). The specification further provides that "[t]he home page provides secure access by each subscriber to each of a plurality of subscriber areas within the system." (*Id.*, col. 2, ll. 54-55).

While the plain language of the claim focuses on the function of the home page once accessed, the specification illustrates that the home page is the entry point to the embodiment contained in Figure 1 and the browser-based portion of the system contained in Figure 3. The parties' proposed constructions are based largely on their respective dictionary definitions. The actual definition for "home page," as cited by Defendants, is "[a]n entry page for a set of Web pages

and other files in a Web site." (Dkt. 68 at p. 3-4 citing Microsoft Computer Dictionary 221 (4th Ed. 1999). While the parties' proposed definitions appear to be consistent with the patent specification, Defendants' use of the term "entry page" is more consistent with the patent specification. The Court construes "homepage" of a website, therefore, to mean "entry page" of a website.

### C. *"browser"/ "browser based subscribers"*

Plaintiff, citing to the Dictionary of Computer and Internet Words at page 35, argues that the term "browser" should be construed as "a program that allows you to find and access documents from anywhere on the Internet." (Dkt. 86 at Ex. 1, p. 3). Plaintiff also relies on the Shames Declaration.[3] Defendants argue that the term "browser-based subscribers" should be construed as "subscribers, as mutually defined by the parties (ie. "a person who pays for access to a service that allows the user to access, view, and enter remotely-stored data"), who use a computer on which only web browser software is required to be installed to access, view, and enter data on HTML forms and documents stored on the database server." (Dkt. 86 at Ex. 2, p. 1).

Defendants cite to the patent specification, the Microsoft Computer Dictionary at pages 62 and 479 and *Resonate*, 338 F.3d at 62 (providing that "[c]onsumers typically access the web using client software applications known as web browsers that run on their personal computers"). As the term "browser" is only used in the context of "browser-based subscribers" in Claim 1, the Court will construe the entire phrase "browser-based subscriber" while utilizing the parties' agreed construction of the term "subscriber." A person skilled in the art would understand the phrase "browser-based subscriber" to mean "a person who pays for access to a service that allows the user to access, view,

---

[3] Shames opines that a "Skilled Person would understand that the term 'browser' means 'a program that allows you to find and access documents from anywhere on the Internet' in the '229 patent." (Dkt. 73 at p. 8).

and enter remotely-stored data utilizing a software application that locates and displays web pages."

The plain language of Claim 1 provides that browser-based subscribers are individuals who have secure electronic access via a modem and an ISP to a home page which provides access to subscriber areas. ('229 patent, col. 5, ll. 55-62). The specification confirms that browser-based subscribers enter the system via a home page and access subscriber areas via a subscriber log-in and password. (*Id.*, col. 3, ll. 51-57). A home page, as defined, is an "entry page" of a website.

In contrast, the plain language of Claim 4, which addresses the direct access system, provides that direct access subscribers can access a direct access server (Citrix®), rather than a home page and subscriber areas, via a modem and ISP. (*Id.*, col. 6, ll. 33-36); *see Phillips*, 415 F.3d at 1314 (other claims of patent in question, even if unasserted, can be valuable sources when determining meaning of a claim term"). The plain language of the claims make clear that the difference between the browser-based subscriber and the direct access subscriber is what is utilized in order to gain access to the desired data and forms. The browser-based subscriber utilizes an internet service provider and a web site while the direct access subscribers utilize an internet service provider and Citrix®.

The specification describes the type of computer used by browser-based subscribers. Defendants correctly note that the browser-based system is depicted in Figure 1 of the specification. (*See* Dkt. 68 at p. 4). "Browser-based subscriber 12 utilizes a single PC-type computer which operates on Windows software. This browser-based subscriber 12 gains access to the system 11 via modem 14 and an internet service provider (ISP) 16. A local network of browser-based subscribers 20 connected to a hub 22 may also gain access to this system 11 via a modem 24 and ISP 26." (*Id.*, col. 3, ll. 45-50).

In contrast to browser-based subscribers who utilize a PC-type computer operating on

Windows software, direct access subscribers who do not necessarily have "state-of-the-art" computer terminals operating on Windows access the same high speed database and query system by connecting via an ISP to a Citrix® type server. (*Id.*, col. 4, ll. 27-37). As noted by Defendants, the specification provides with respect to browser-based subscribers that "no new software is required to be installed, no new hardware is required to be purchased and connection is made at normal modem speed." (*Id.*, col. 2, ll. 38-41). Defendants therefore argue for a construction that includes reference to a "computer on which only web browser software is required to be installed."

While Defendants' proposed construction attempts to encompass the type of computer utilized by browser-based subscribers described in the specification, the Court finds that, based on the plain language of the claims, the construction should focus on what browser-based subscribers utilize in order to gain access to the information sought rather than on the type of computer used. While Plaintiff's definition focuses on the program utilized, Plaintiff's dictionary definition of browser as a program "that allows you to find and access documents from anywhere on the Internet" is inconsistent with the claim.

The browser-based subscribers access documents through secured subscriber areas rather than from "anywhere on the internet". Webopedia defines "browser" as "a software application used to locate and display web pages."[4] This definition is consistent with the plain language of the claim which provides that browser-based subscribers utilize the web. Accordingly, the Court declines to adopt either parties' construction of the term "browser" and construes the phrase "browser-based subscriber" to mean "a person who pays for access to a service that allows the user to access, view, and enter remotely-stored data utilizing a software application that locates and displays web pages."

---

[4] *http://www.webopedia.com/TERM/b/browser.html*

11

D. *"electronic access"*

Plaintiff, citing The Computer Glossary 129 (9th Ed. 2001) and the Dictionary of Computer and Internet Words at page 1, argues that the term "electronic access" should be construed as "the ability to gain entry to or use a computer or other devices." (Dkt. 86 at Ex. 1, p. 2). Plaintiff also relies on the Shames declaration.[5] Defendants have not proposed an alternate construction.

The plain language of the claim provides that browser-based subscribers have electronic access to a home page via a modem and the ISP. ('229 patent, col. 5, ll. 57-59). The Court finds that Plaintiff's use of the phrase "or other devices" unnecessarily expands the scope of the plain language of the claim itself. The claim only requires a computer for access to the billing system. Accordingly, the Court finds that a person skilled in the art would understand the phrase "electronic access" as used in Claim 1 to be "the ability to gain entry to or use a computer."

E. *"secure access"*

Plaintiff contends that one need only consider the specification to construct "secure access." (Dkt 64, p. 10). Additionally, Plaintiff relies on the Dictionary of Computer and Internet Words at pages 1 and 247 for definitions of "security" and "access," arguing that "secure access" should be construed as "the prevention of unauthorized entry or use of a directory, file, program, or device on a computer system or over a network." (Dkt. 86 at Ex. 1, p. 1). Plaintiff does not, however, include a construction of 'access' in its ordinary meaning.

Defendants on the other hand contend that the entire phrase "said home page providing only secure access by each browser-based subscriber to one of a plurality of subscriber areas within said

_____

[5] Shames opines that "[a] Skilled Person would understand that the term 'electronic access' means 'the ability to gain entry to or use a computer or other devices' in the '229 patent." (Dkt. 73 at p. 9).

system" must be construed. The Court disagrees. Those additional substantive terms are being construed separately. Further, Defendants' suggested construction of "[a] home page of a web site, as construed above, that provides *only for the entry of a unique subscriber log-in and password . . . .*" (emphasis added), would improperly import a limitation from the specification into the claim. *See Burke, Inc.*, 183 F.3d at 1340. The specification explains that a "unique subscriber log-in and password" provides a "secure access" to a subscriber area. The claim merely references the home page as "providing only secure access by each browser-based subscriber to one of a plurality of subscriber areas" and says nothing about a "unique subscriber log in and password."

The term "secure access" can be construed in accordance with its ordinary meaning, considered in the context of the entire claim. Its meaning is readily apparent and does not require elaborate interpretation. General purpose dictionaries are helpful in this circumstance, however. *Phillips,* 415 F.3d at 1314. A person skilled in the art would understand the term "secure access" to mean "the ability to gain entry to and make authorized use of, such that unauthorized entry and use is prevented."

The plain language of Claim 1 states that the home page provides only secure access to one of a plurality of subscriber areas. ('229 patent, col. 5, ll. 60-63). The Court interprets this plain language to mean that the only type of access provided is "secure." The specification supports this conclusion. "Each of the subscribers 12 and 20 enter the system 11 via a home page 18 of a website of the system 11. A unique subscriber log-in and password provides a secure access to a subscriber area 28 which then provides access to data forms (not shown) of a software application which are transferred to, and appear on the screen of each remote subscribers PC." (*Id.*, col. 3, ll. 50-57).

The Dictionary of Computer and Internet Words defines "security" as the "prevention of

unauthorized use of a program and device" and "access" as "the ability to locate, gain entry to, and use a directory, file, or device on a computer system or over a network." (Dkt. 64 at Ex. 6, pp.1, 247). These definitions are consistent with the patent claim and specification. Accordingly, the Court construes the term "secure access" to mean "the ability to gain entry to and make authorized use of, such that unauthorized entry and use is prevented."

### F. *"subscriber areas"*

Plaintiff initially contended that construction of the term "subscriber areas" could be "readily ascertained" from the specification. (Dkt. 64, p. 10). Plaintiff now relies on extrinsic evidence, including the Shames affidavit.[6] As Defendant correctly points out, "subscriber areas" is not defined in the patent, although the term is used throughout the specification and claim. According to the plain language of the claim, a subscriber gains "secure access" to a "subscriber area," from which "billing and data entry forms" are transferred to the subscriber, who completes the forms. The completed forms are electronically returned to a "corresponding subscriber area," which are then entered into the database. ('229 patent, col. 5, ll. 60-67). The specification explains this. (*Id.*, col. 3, ll 53-56, 58-59). The "subscriber areas" therefore provide (1) secure access to and transfer of forms to subscribers, and (2) transfer of data in the completed forms into the database.

Plaintiff argues that the term "subscriber areas" should be construed as "a system component that transfers forms between a database server and a subscriber." (Dkt. 86 at Ex. 1, p. 3). Defendants argue that the phrase should be construed as "the portion of the database unique to that subscriber." (*See* Dkt. 86 at Ex. 2, p. 1). The Court finds that a person skilled in the art would

---

[6] Shames opines that "[a] Skilled Person would understand that the term 'subscriber areas' means 'a system component that transfers forms between a server and a subscriber' in the '229 patent." (Dkt. 73, p. 7).

understand the term "subscriber areas" to mean "a system component unique to that subscriber that transfers forms between a database server and a subscriber."

Claim 1 provides that the home page provides only secure access by subscribers to one of a plurality of *subscriber areas* within the system. ('229 patent, col. 5, ll. 60-63)(emphasis added). The claim provides that once these subscriber areas are accessed, subscribers can obtain electronic transfer of "substantially only billing and data entry forms" and "real time electronic viewing and query access of stored data and billings." (*Id.*, col. 5, l. 63-64, col. 6, l. 5-6). As noted, the specification provides that the subscriber area "provides access to data forms (not shown) of a software application which are transferred to, and appear on the screen of each remote subscribers PC." (*Id.*, col. 3, ll. 50-57).

The specification provides that forms are transferred into the database server from Billingnetwork PCs: "Input and query forms are developed within the system 11 by billing network PC work stations 38 which are connected at hub 36, all forms and information input being subject to business rules and logic at 34 before entered into the database server 32." (*Id.*, col 4, ll. 13-18). The specification also provides that "[o]nce into the particular browser-based subscriber area 80 within the system 71, each browser-based subscriber 72 will have access to one of several customized forms that they will complete electronically at their work station and transfer to the database server 90. Form development and customization will be done within the system at internal work stations 106 by employees of the system." (*Id.*, col. 5, ll. 12-18). According to the descriptions, Figure 1 depicts the developed forms passing through the database server in order to reach the subscriber areas.

While Defendants correctly note that the subscriber area is unique to each individual

subscriber as evidenced by the secure access provided, Defendants' construction ignores the purpose of the subscriber areas, which is to facilitate the transfer forms and data. (*See id.*, col. 3, ll. 52-54). Accordingly, the Court construes the term "subscriber area" to mean "a system component unique to that subscriber that transfers forms between a database server and a subscriber."

G. *"controlling said forms"*

Plaintiff argues that construction of the term "controlling said forms" can be readily ascertained from the specification. The Court agrees, in part, if the term is considered in the context of the entire claim. Although "controlling said forms" is utilized in a description of the subscriber's "PC type computer electronically connected to said database server," the forms referred to are plainly those "billing and data entry forms" "required" by Plaintiff's "integrated internet billing, data processing, and communication system," or, as the specification describes, "a framework for data entry." In that regard, the Court agrees with Plaintiff's construction and notes that the specification uses this precise phrase in describing how the forms are utilized.[7]

"Controlling" the forms is not readily ascertainable from the specifications, however. Plaintiff urges a construction of: "managing" a framework for data entry. (Dkt. 86 at Ex. 1, p. 1). In that regard, Plaintiff relies on the Microsoft Press Computer User's Dictionary 83 (1998) definition of "control." Defendants' suggested construction uses the phrase "develop and customize."[8]

---

[7] "[t]hus, the forms transferred to each subscribers PC screen *provide a framework for data entry* of essential data such as the person or company being billed, where the bill is to be sent and charges for services rendered." ('229 patent, col. 3, ll. 66-67, col. 4, ll. 1-2).

[8] Defendants argue that the entire phrase "a PC type computer electronically connected to said database server for controlling said forms as required and responding to queries entered by each browser-based subscriber" should be construed as "[a] PC type computer, as mutually defined by the parties, that:

The plain language of the claim provides that the purpose of the PC type computer electronically connected to the database server is twofold, the first being "controlling said forms as required." The referenced "forms" are the billing and data entry forms described in paragraph 3 of Claim 1. The second purpose, responding to queries, is discussed below.

The specification provides that "[o]nce into the particular browser-based subscriber area 80 within the system 71, each browser-based subscriber 72 will have access to one of several *customized* forms that they will complete electronically at their work station and transfer to the database server 90. (emphasis added). Further, the specification expressly provides that " *Form development and customization* will be done within the system at internal work stations 106 by employees of the system." *(Id.*, col. 5, ll. 12-18)(emphasis added). This particular section references form "development and customization" at 106 in Figure 3, the Billingnetwork PC described in the plain language of Claim 1.

The specification further provides that, "[i]nput and query forms are *developed* within the system 11 by billing network PC work stations 38 which are connected at hub 36, all forms and information input being subject to business rules and logic at 34 before entered into the database server 32." *(Id.*, col 4, ll. 13-18)(emphasis added). Based on these references, the Court finds that Defendants' proposed construction of "development and customization" more accurately defines the term "controlling", as opposed to "managing." Accordingly, the Court finds that a person skilled in the art would understand the term "controlling said forms" to mean "developing and customizing

---

(1) is electronically connected to the database server; (2) *is used to develop and customize forms*; and (3) submits information requested by a browser-based subscriber in response to a specific set of instructions entered by the subscriber." (Dkt. 86 at Ex. 2, p. 3)(emphasis added). Again, the court disagrees that it is necessary to construe the entire phrase as Defendants urge.

frameworks for data entry" and construes it accordingly.

### H. *"responding to queries"*

Plaintiff argues that this phrase should be construed as "replying to requests to a database for information", relying on the American Heritage Dictionary of the English Language 712 (4th Ed. 2001), the Dictionary of Computer and Internet Words at page 227 and the Shames Declaration.(Dkt. 86 at Ex. 1, p. 2). Defendants argue, as noted, that the entire phrase "a PC type computer electronically connected to said database server for controlling said forms as required and responding to queries entered by each browser-based subscriber," should be construed as "[a] PC type computer, as mutually defined by the parties, that: (1) is electronically connected to the database server; (2) is used to develop and customize forms; and (3) *submits information requested by a browser-based subscriber in response to a specific set of instructions entered by the subscriber*."

The plain language of Claim 1 provides that the second function of the PC type computer electronically connected to the database server is to respond to queries entered by each browser-based subscriber. ('229 patent, col. 5, ll. 12-13). The specification provides that "[i]nput and query forms are developed within the system 11 by billing network PC work stations 38 which are connected at hub 36 . . . ." (*Id.*, col. 4, ll. 13-16). The specification provides that "[f]orms which enter a query into the database server 90 will be output back to the browser-based subscriber terminal 72." (*Id.*, col.5, ll. 26-28). This citation suggests that information will be provided to the browser-based subscriber in response to a query.

The specification also provides that "[t]he forms also establish query links to the database server 32. Query forms (not shown) are also available for transmission to the remote PC screen of each browser-based subscriber 12 and 20. These query forms provide each subscriber with access

to the database server 32 which, in combination with drop-down lists, select the desired account for access to the database of the data server 32 *to retrieve the requested information* to the screen of the remote PC." (*Id.*, col. 4, ll. 6-13)(emphasis added).

Defendants suggest that the Court include the phrase "in response to a specific set of instructions entered by the subscriber" in the construction of the term. That construction is not suggested by the specification and would improperly import a limitation into the claim. *See Burke, Inc.*, 183 F.3d at 1340. The Court finds that Plaintiff's proposed construction is consistent with the plain language of Claim 1 and the specification. The phrase "responding to queries" is accordingly construed to mean "replying to requests to a database for information."

### IV. Legal Framework for Construing Means-Plus-Function Limitations

The parties agree that Claim 1 contains two "means-plus-function limitations": (1) the "means for providing electronic transfer" and (2) the "means for providing electronic viewing. "[A]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6 (2000). A means-plus-function limitation recites a "function to be performed rather than definite structure or materials for performing that function" and must not recite a "definite structure *which performs the described function*." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1307-08, 46 U.S.P.Q.2d 1752 (Fed. Cir. 1998); *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531, 41 U.S.P.Q.2d 1001 (Fed. Cir. 1996)(emphasis added).

The first step in construing a means-plus-function limitation is "to identify the function

explicitly recited in the claim." *Asyst Technologies, Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369 (Fed. Cir. 2001). The second step is to "identify the corresponding structure set forth in the written description that performs the function set forth in the claim" as understood by one skilled in the art. *Id.*; *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1379, 53 U.S.P.Q.2d 1225 (Fed. Cir. 1999).

A function cannot be adopted which is different from that "explicitly recited in the claim." *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258, 52 U.S.P.Q.2d 1258 (Fed. Cir. 1999). In exchange for the ability of a patentee to use means expressions under Section 112 and avoid reciting in a claim "all possible structures that could be used as means," the patentee's claim must be limited to "the means specified in the written description and equivalents thereof." *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211, 68 U.S.P.Q.2d 1263 (Fed. Cir. 2003), *cert. denied*, 344 F.3d 1205 (2004); *see Chiuminatta Concrete Concepts, Inc.*, 145 F.3d at 1307-08. Accordingly, the function is found by looking at the claim language itself while the structure is found by looking to the specification.

The corresponding structure must "actually perform the recited function, not merely enable the pertinent structure to operate as intended . . . ." *Asyst Technologies, Inc.*, 268 F.3d at 1371. Structure is only "corresponding structure" if it is clearly linked in the specification or prosecution history to the function recited. *Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).

### V. Construction of Means-plus-function Limitations

#### A. "Means for Providing Electronic Transfer"

*A. "means for providing electronic transfer of substantially only billing and data entry*

> *forms to the browser-based subscriber upon request, data entered on said forms, when electronically returned to a corresponding said subscriber area, then entered into said database server, said database server then, utilizing an appropriate application software thereon, producing billing invoices and statements to clients and customers, for each corresponding browser-based subscriber. "*

Plaintiff argues that the function performed by the electronic transfer means is explicitly set out in Claim 1. (Dkt. 64 at p. 12). Plaintiff argues that the corresponding structure is disclosed in the specification which provides, "[f]orms are completed and transferred from the corresponding subscriber area 28 for forwarding into a database server 32 which is of the open database compliant type (ODBC). " ('229 patent, col. 3, ll. 58-60). The specification also states, "[o]nce into the particular browser-based subscriber area 80 within the system 71, each browser-based subscriber 72 will have access to one of several customized forms that they will complete electronically at their work station and transfer to the database server 90." (*Id.*, col. 5, ll. 12-16).[9]

Defendants respond that the entire "means for providing electronic transfer" phrase quoted above cannot constitute the entire limitation or function because the phrase contains structural elements such as "database server," "appropriate application software" and "invoices and statements." (Dkt. 68 at p. 9). Defendants argue that the proper function of the cited limitation is limited to, "providing electronic transfer of substantially only billing and data entry forms to the browser-based subscriber upon request." Defendants argue that this properly identified function requires a construction reflecting that the transfer is of substantially only (1) billing forms; and (2) data entry forms.

Defendants further contend that Claim 1 is invalid as indefinite because no structure is

---

[9] Plaintiff's third citation to the specification language contained in column 4, lines 27-44, is inapplicable as this passage clearly describes the direct access embodiment not at issue here.

disclosed in the specification relating to the function.  Specifically, Defendants argue that the passage contained in Plaintiff's first citation, column 3, lines 58-60, merely recites the function and describes the transfer of forms *to* the database server rather than *from* the database server.  Defendants argue that the passage contained in Plaintiff's second citation, column 5, lines 12-16, relates to the combination system depicted in Figure 3 of the '229 patent.  During the *Markman* hearing, however, counsel for Defendants conceded that the portions of the combination system referring to the browser-based elements may be relevant to Claim 1.  Finally, Defendants argue that Plaintiff failed to identify an algorithm corresponding to the function as is required when dealing with a computer implemented function.

Plaintiff replies that a means-plus-function limitation can contain structural elements. (Dkt. 72 at p. 2).  Plaintiff further argues that the specification with respect to a computer implemented function need only disclose an algorithm that "resembles" the functional language.  Plaintiff asserts that the algorithm is disclosed in the specification:

> "[s]ubscribers will access the database through the internet via either thin client technology and the Citrix® server or via browser-based forms processing. Both methods will access the database server.  Data entered via forms processing is transferred into the database server which utilizes appropriate application software therein to produce billing invoices and statements to clients and customers of each corresponding browser-based subscriber.  The proprietary database will then produce billing invoices and statements to clients of each corresponding browser-based subscriber." ('229 patent, col. 2, ll. 56-63).

1. Inclusion of structural elements within the limitation

A means-plus-function limitation can contain structural elements so long as the limitation does not contain the very structure responsible for carrying out the disclosed function. *Phillips*, 415 F.3d at 131("[m]eans plus function claiming applies only to purely functional limitations that do not

22

provide the structure *that performs the recited function*")(emphasis added); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991)(stating "[t]he recitation of some structure in a means plus function element does not preclude the applicability of section 112(6)").

The applicable statute provides, in part, that an element may be expressed as a means "for performing a specified function without the recital of structure, material, or acts *in support thereof.* . . ." 35 U.S.C. § 112, ¶ 6 (emphasis added). Further, a claim term is presumed to be written in means-plus-function form when the word "means" is used. *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1374, 66 U.S.P.Q.2d 1444 (Fed. Cir. 2003). This presumption can be overcome if the claim term recites no function or "recites sufficient structure *for performing that function.*" *Id.*(emphasis added).

Accordingly, it must be determined whether Plaintiff has impermissibly included the very structure responsible for carrying out the function disclosed within the limitation. Here, the limitation is presumed to be written in means-plus-function form because the word "means" is used. *See Apex Inc.*, 325 F.3d at 1371. Defendants have overcome this presumption, in part, by showing by a preponderance of the evidence, that the last part of the limitation recites sufficient structure for performing the function. *See id.* at 1372.

The final phrase in the limitation, "said database server then, utilizing an appropriate application software thereon, producing billing invoices and statements to clients and customers, for each corresponding browser-based subscriber," discloses the very structure for performing the function of producing billing invoices and statements, the database server (utilizing an appropriate application software thereon). It must therefore be determined whether this constitutes "sufficient structure." *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1376, 65 U.S.P.Q.2d 1865 (Fed. Cir.

23

2003) (upholding finding that claim term was written in means-plus-function language despite inclusion of structure for performing function where structure was not sufficient to "perform the entirety of the function").

The plain language of Claim 1 suggests that the database server, utilizing software, is the structure that produces the billing invoices and statements. Further, the specification provides that "[t]he effective output for browser-based subscribers 72 will be through forms processing resulting in a billing output from 104." ('229 patent, col. 5, ll. 24-26). Figure 3 shows that the "output" labeled "104" flows from the database server. The specification also provides that "[t]he proprietary database will then produce billing invoices and statements to clients of each corresponding browser-based subscriber." (*Id.*, col. 2, ll. 56-63).

The Court finds that the phrase "said database server then, utilizing an appropriate application software thereon, producing billing invoices and statements to clients and customers, for each corresponding browser-based subscriber" within the "means for providing electronic transfer" limitation cites sufficient structure for performing the linked function which cannot, therefore, be construed as part of the means-plus-function limitation. *See Apex Inc.*, 325 F.3d at 1371; *see also Phillips*, 415 F.3d at 1311. The Court agrees with Defendant's assertion, however, that according to the plain language of the claim, this phrase should be construed to require that the database server produce billing invoices to clients, billing invoices to customers, statements to clients and statements to customers. (*See* Dkt. 68 at p. 16).

The patent history reveals, in the examiner's statement for reasons for allowance:

"[t]he present invention comprises an integrated billing, data processing, and communication system. The closest prior art, Reeder (US 5,852,812) shows a method for billing customers for on-line services. The billing process is done in real-

24

time.  However Reeder fails to disclose means for providing electronic transfer of substantially only billing and data entry forms to a subscriber, returning the completed forms to a database server, and producing billing invoices and statements to clients and customers.  This distinct feature is claimed in all of the independent claims."

While this history reveals the importance of that portion of the claim regarding the production of billing invoices and statements to clients and customers, it does not cure the fact that the very structure responsible for carrying out the function is disclosed in the claim language.  The section cannot be read as part of the "means-plus-function" limitation.

The remaining portion of the limitation, "providing electronic transfer of substantially only billing and data entry forms to the browser-based subscriber upon request, data entered on said forms, when electronically returned to a corresponding said subscriber area, then entered into said database server", is properly stated in means-plus-function terms as any cited structure is not responsible for carrying out the disclosed function.  Accordingly, the limitation properly includes only the "means for providing electronic transfer of substantially only billing and data entry forms to the browser-based subscriber upon request, data entered on said forms, when electronically returned to a corresponding said subscriber area, then entered into said database server."

2. Indefiniteness of "Appropriate Application Software"

Defendants argue that use of "appropriate application software" in the phrase "said database server then, utilizing an appropriate application software thereon, producing billing invoices and statements to clients and customers, for each corresponding browser-based subscriber," renders Claim 1 indefinite and invalid under 35 U.S.C. §112, ¶2.  Defendants argue that the term has a purely subjective meaning and does not adequately advise the public of the scope of the invention. Further, Defendants argue that the specification and prosecution history fail to provide any objective

definition for determining whether software is "appropriate."  Defendants cite to the declaration of

James Whicker, who opines that one of ordinary skill would conclude that Claim 1 is indefinite

because the phrase "appropriate application software" does not "delineate the scope of the

invention." (Dkt. 68 at Ex. C, ¶ 20).[10]

"The specification shall conclude with one or more claims particularly pointing out and

distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. §112,

¶ 2. This requirement ensures that the public is adequately notified of the patentee's right to exclude.

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). The requirement

"does not compel absolute clarity" and only claims that are "not amenable to construction" or are

"insolubly ambiguous" are indefinite.  *Id.*  Such an approach respects the statutory presumption of

patent validity.  *Exxon Research and Engineering Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001);

35 U.S.C. § 282.  Close questions of invalidity in cases involving issued patents are resolved in favor

---

[10] Plaintiff replies that Defendants' argument is inconsistent with its contention that a database
server "utilizing appropriate application software" is sufficient structure to overcome the presumption
that the section of the "means for providing electronic transfer" limitation containing that phrase is
written in means-plus-function format.  Plaintiff further argues that the claims and specification clearly
indicate that the type of software application claimed is software that "produces billing invoices and
statements to clients of each corresponding browser-based subscriber."  Finally, Plaintiff argues that the
Court must disregard the declaration of James Whicker on substantive and procedural grounds.

The Court agrees that Defendants' arguments that: (1) the inclusion of this sufficiently specific
term overcomes the presumption that the phrase is written in "means-plus-function" format and (2) the
phrase is indefinite so as to render Claim 1 invalid, are inconsistent positions.  The Court has already
determined that the database utilizing appropriate application software constitutes sufficient structure to
remove the phrase from the means-plus-function limitation.

Because the Court finds that Plaintiff's expert's conclusion is consistent with the specification,
the Court need not address Plaintiff's argument that Defendants' expert affidavit is barred on substantive
and procedural grounds.

of the patentee. *Id.* at 1380. The determination of whether a claim is invalid for indefiniteness depends on whether those skilled in the art would understand the scope of the claim when read in light of the specification. *Verve, LLC v. Crane Cams, Inc.,* 311 F.3d 1116, 1119-20 (Fed. Cir. 2002); *Atmel Corp. v. Information Storage Devices, Inc.,* 198 F.3d at 1378 (citing *North Am. Vaccine Inc., v. American Cyanamid Co.,* 7 F.3d 1571, 1579 (Fed. Cir. 1993)).

Defendants' expert opines that one of ordinary skill would not be able to discern from the specification what constitutes "appropriate software." (Dkt. 68 at Ex. C, p. 9). In contrast, Plaintiff's expert opines that "every major database system available on the marketplace had certain inherent tools built into their infrastructures that would allow 'appropriate application software' to be utilized." (Dkt. 72 at Ex. 4, p. 6). The most common type of "appropriate application software" involves "normalized transactional processing" which allows the addition, modification, deletion and reporting of database record sets. (*Id.*); *see Verve, LLC,* 311 F.3d at 1119 (instructing that extrinsic evidence should be consulted before determining that a claim term is indefinite).

The plain language of the claim itself indicates that the "appropriate application software" is utilized by the database server to produce billing invoices and statements to clients and customers. The specification confirms that "[d]ata entered via forms processing is transferred into the database server which utilizes appropriate application software therein to produce billing invoices and statements to clients and customers of each corresponding browser-based subscriber." ('229 patent, col. 2, ll. 59-63). The specification provides that no new software is required to be installed at the subscriber's computer as the subscriber is able to access the database server with its software and applications "contained thereon." (*Id.*, col. 2, ll. 38-46, 66, col.3, ll. 1-3). The specification also provides, at the least, that the database allows for the addition and reporting of information.

Subscribers enter information on forms which are added to the database server. (*Id.*, col. 3, ll. 58-61). The database server reports information back to the subscriber and creates billings. (*Id.*, col. 4, ll. 9-14, 5, ll. 24-28).

These provisions are consistent with Plaintiff's expert's conclusion that a person of ordinary skill would understand the term "appropriate application software," in light of the claim language and specification, to refer to software that allows for "normalized transactional processing," or, specifically, for the addition and reporting of database record sets. Accordingly, the phrase "appropriate application software" is not subject to a purely subjective definition, as was the case in *Datamize,* and the Court will resolve this matter in favor of the patentee. *See* 417 F.3d at 1352 (finding that the term "aesthetically pleasing" used in the claim language was indefinite because the claim, specification and prosecution history provided no guidance as to what conditions would meet the "aesthetically pleasing" requirement). The Court rejects Defendant's contention that Claim 1 is invalid as indefinite.

### 3. Construction of the function

While Plaintiff asserts that the function for the "electronic transfer means" is clearly stated, Defendants argue that "billing and data entry forms" must be construed by the Court. Defendants assert that the specification describes a billing form as a "form on which a subscriber enters essential financial data 'such as the person or company being billed, where the bill is to be sent and charges for services rendered'." (Dkt. 68 at p. 10, citing '229 patent, col. 3, l. 67- col. 4, l. 2). Defendants argue that a data entry form must therefore be a form on which different information is inserted.

It is unclear from the plain language of the claim whether the phrase "billing and data entry forms" refers to two distinct types of forms or one type of form for "billing and data entry." The

specification, however, provides guidance. The specification discusses two different types of forms, data or input forms and query forms. The forms that result in billing output are described interchangeably as "data forms," "forms," and "input forms." Subscribers gain access to "data forms" in their subscriber area. ('229 patent, col. 3, ll. 51-55). These "forms" are completed and transferred to the database server. (*Id.*, col. 3, ll. 58-59). The "input forms" are transferred to the database server subject to certain logic rules. (*Id.*, col. 3, ll. 61-62). The "forms" provide a framework for data entry. (*Id.*, col. 3, ll. 66-67). These are the forms addressed in the "means for providing electronic transfer" limitation.

The specification also addresses query forms. "[Q]uery forms (not shown) are *also* available for transmission to the remote PC screen of each browser-based subscriber 12 and 20." (*Id,* col. 4, ll. 7-9)(emphasis added). These are the forms addressed in the "means for providing real time electronic viewing" limitation. Both "input and query forms" are developed by Billingnetwork PCs and both "data and query forms" are transferred without the need for underlying software applications. (*Id.*, col. 4, ll. 13-14, 23-24). All of these citations support the conclusion that the "billing and data entry forms" addressed in the "means for providing electronic transfer" limitation refer to one type of form for both billing and data entry.

Accordingly, the Court rejects Defendants' proposed limitation of "billing and data entry forms" and finds it unnecessary to further construe the phrase "billing and data entry forms."The language of the means-plus-limitation provides sufficient context within which to define the function. Courts often utilize the language of the means-plus-limitation to define the function. *See Medtronic, Inc.*, 248 F.3d at 1311 (finding that the proper function of the "means for connecting adjacent elements together" was "connecting adjacent elements together"); *see also Micro Chemical,*

*Inc.*, 194 F.3d at 1258 (finding that the proper function of the "weighing means for determining the weights of selective additives dispensed by said dispensing means from said storage means" was "determining the weights of selected additives"). Accordingly, the Court construes the applicable function to be "providing electronic transfer of substantially only billing and data entry forms to the browser-based subscriber upon request, data entered on said forms, when electronically returned to a corresponding said subscriber area, then entered into said database server."

### 4. Identification of Corresponding Structure

Defendants argue that the limitation is "indefinite" because there is no corresponding structure contained in the specification and Plaintiff has failed specifically to disclose an algorithm in connection with the function as is required by *WMS Gaming v. International Game Technology,* 184 F.3d 1339 (Fed. Cir. 1999) and *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005). (Dkt. 68 at p. 11-12). Plaintiff does not contend that it is not required to disclose an algorithm. Rather, Plaintiff contends that it has sufficiently disclosed an algorithm that "resembles the functional language" of the limitation as required by *Harris Corp.* 417 F.3d 1241. Essentially, Plaintiff argues that the algorithm need only resemble the function.

Plaintiff asserts that the algorithm performing the means for electronic transfer is disclosed in the specification:

> "[s]ubscribers will access the database through the internet via either thin client technology and the Citrix® server or via browser-based forms processing. Both methods will access the database server. Data entered via forms processing is transferred into the database server which utilizes appropriate application software therein to produce billing invoices and statements to clients and customers of each corresponding browser-based subscriber." ('229 patent, col. 2, ll. 56-63).

"In a means-plus-function claim in which the disclosed structure is a computer or

30

microprocessor programmed to carry out an algorithm, the disclosed structure is not the general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming,* 184 F.3d at 1349.[11]  In that case, the corresponding structure was a microprocessor "programmed to assign a plurality of single numbers to stop positions". The algorithm resembled the function.

In *Harris,* the Court observed that "*WMS Gaming* restricts computer-implemented means-plus-function terms to the algorithm disclosed in the specification." 417 F.3d at 1253. "A computer-implemented means-plus-function term is limited to the corresponding structure defined in the specification and equivalents thereof, and the corresponding structure is the algorithm." *Id.*  In *Harris,* the Court found that the structure associated with the means-plus-function was "the microprocessor programmed to carry out a two-step algorithm in which the processor calculates generally nondiscrete estimates and then selects the discrete value closest to each estimate." *Id.* at 1254 (emphasis added).  There, the algorithm carried out by the microprocessor resembled the function.

Here, the provision Plaintiff relies on cannot constitute the entire algorithm.[12]  That provision addresses the ultimate transfer of forms into the database server but does not describe the transfer of billing or data entry forms to the subscriber upon request or the return of the forms to the

---

[11]  *WMS Gaming* involved a patent for a slot machine designed to reduce the odds of winning while maintaining outward appearances. The district court erred when it determined that the structure for performing the "means for assigning numbers" function was "an algorithm executed by the computer" rather than the specific algorithm disclosed in the specification. 184 F.3d at 1348.

[12]  Plaintiff relies on: "[s]ubscribers will access the database through the internet via either thin client technology and the Citrix® server or via browser-based forms processing.  Both methods will access the database server.  Data entered via forms processing is transferred into the database server which utilizes appropriate application software therein to produce billing invoices and statements to clients and customers of each corresponding browser-based subscriber." ('229 patent, col. 2, ll. 56-63).

corresponding said subscriber area. It also includes that portion of the limitation the Court has found

cannot to be included in the limitation, the "production of billing invoices and statements by the

database server utilizing appropriate application software".

Accordingly, the Court looks to other parts of the specification to determine whether they

contribute to disclosure of an algorithm.  The specification provides that "[i]nput and query forms

are developed within the system 11 by billing network PC work stations 38 which are connected at

hub 36, all forms and information input being subject to business rules and logic at 34 before entered

into the database server 32." ('229 patent at col. 4, ll. 13-18). With respect to the combination

system depicted in Figure 3, the specification provides that "[o]nce into the particular browser-based

subscriber area 80 within the system 71, each browser-based subscriber 72 will have access to one

of several customized forms that they will complete electronically at their work station and transfer

to the database server 90." (*Id.*, col. 5, ll. 12-16).  More specifically, with respect to the browser-

based system depicted in Figure 1, the specification provides:

> "[e]ach of the subscribers 12 and 20 enter the system 11 via a home page 18
> of a website of the system 11. A unique subscriber log-in and password provides a
> secure access to a subscriber area 28 *which then provides access to data forms (not
> shown) of a software application which are transferred to, and appear on the screen
> of each remote subscribers PC.*"[13] (*Id.*, col. 3, ll. 51-57).

The provision relied on by Plaintiff describes the return of the completed forms to the

subscriber area and the database server:

> "Forms are completed and transferred from the corresponding subscriber area
> 28 for forwarding into a database server 32 which is of the open database compliant
> type (ODBC).  The input forms are transferred into the database server subject to

---

[13] The court notes that although the specification describes the transfer of data forms to the
screen of each remote subscribers PC, Figure 1 does not depict arrows from the subscriber area to the
subscriber PC.

certain business logic and rules at 30. This is a software based function which insures that each subscriber's database is altered in accordance with rules set forth in this software function at 30." (*Id.*, col. 3, ll. 58-65).

These specification provisions, considered together, adequately describe the algorithm, or process, by which the computer performs the function of transferring billing and data entry forms to the subscriber upon request and then back to the subscriber area and database server once information is entered. The specification reveals that the structure performing the function is the computer system programmed to transfer data forms from the PC type computer (38, 106) to the database server (32, 90), to the subscriber area (28, 80), to the subscriber PC (12, 72), then to return the completed forms from the subscriber PC to the subscriber area and back to the database server. These specification provisions, when read with Figures 1 and 3, provide sufficient information indicating the algorithm by which the computer system performs the disclosed function.[14]

### B. *"means for providing real time electronic viewing and query access of data and billings stored in said database server by each corresponding browser-based subscriber."*

Plaintiff argues that the function performed by the electronic viewing means is explicitly set out in Claim 1. (Dkt. 64 at p. 13). Plaintiff argues that the corresponding structure is disclosed in the specification: "[t]he effective output for browser-based subscribers 72 will be through forms processing resulting in a billing output from 104. Forms which enter a query into the database server

---

[14] *Gobeli Research Ltd. v. Apple Computer, Inc.,* 384 F. Supp. 2d 1016, 1023 (E.D. Tex. 2005), cited by Defendants, is distinguishable. There, the district court found that claim 7 of a patent providing for a computer interrupt handler that could process multiple interrupts from faxes and printers at the same time was invalid for failure to provide an algorithm in the specification. *Id.* The Court rejected the plaintiff's proposed structure associated with the function, "a microprocessor running a procedure call that sets aside resources, such as a memory area." *Id.* at 1022-23. The Court unsuccessfully searched the specifications for a disclosed algorithm performing the "means for reallocating processing resources unused by said specific portions to other specific portions as a function of task priority" limitation. *Id.* at 1023. The Court also noted that the plaintiff could have provided figures or flow charts to describe the algorithm or attached actual code but failed to do so. *Id.*

90 will be output back to the browser-based subscriber terminal 72. These reports may be printed by the browser-based subscriber if desired." ('229 patent, col. 5, ll. 24-29).

Defendants argue that the term "real time" must be construed and that any construction should emphasize that the function allows viewing of *both* data and billings as well as query access of *both* data and billings. (Dkt. 68 at p. 17). Defendants argue that the function is "to electronically access, *all the time*, both the forms submitted by the [subscriber] as well as the bills generated after the forms are processed through the application software." (Dkt. 68 at p. 18)(emphasis added). In support, Defendants rely on an Order entered in *Billingnetwork.com v. Advanced Healthcare Billing, Inc.*, 8:03-cv-927-T-30EAJ, where the court found that the means-plus-function limitation described an invention "that allows users to *at any time instantaneously* view and search electronically for both their data and billing information stored in a database." *Id.* at p. 9 (emphasis added).

Defendants argue that there is no disclosed structure or algorithm associated with this function and that Plaintiff's citation to the specification refers to function rather than structure. Defendants argue, therefore, that the limitation is invalid as indefinite. Plaintiff counters that the specification language cited is the disclosed algorithm which resembles the functional language of the electronic viewing means. (Dkt. 72 at p. 6).

The nature of the function must first be determined. With respect to the direct access embodiment, the specification provides: "[t]hin client access provides for transfer of billing information in real time between the subscriber and the servers. The subscriber will have *instantaneous* access to the data and enter data directly into secure subscriber data sets." ('229 patent, col.3, ll. 8-11)(emphasis added).

While use of "real time" refers to the direct access embodiment rather than the browser-

34

based embodiment, the specification nevertheless equates "real time" access with instantaneous access. Accordingly, the Court agrees with *Billingnetwork.com v. Advanced Healthcare Billing, Inc.*, *supra*, that "real time" means "instantaneous." Further, use of the conjunctive "and" does reflect that the means provides viewing and query access of *both* data and billings. Accordingly, the Court construes the function "providing instantaneous electronic viewing and query access of both data and billings stored in the database server by each corresponding browser-based subscriber."

Next, it must be determined whether there is a disclosed algorithm in the specification which performs the recited function. The specification provides:

> "[i]nput and query forms are developed within the system 11 by billing network PC work stations 38 which are connected at hub 36, all forms and information input being subject to business rules and logic at 34 before entered into the database server 32." ('229 patent at col. 4, ll. 13-18). "The data and query forms are transferred without the need for having the underlying software applications on the subscriber computer hard drive which greatly facilitates both speed and conveyance." (*Id.*, col. 4, ll. 22-26). "Once into the particular browser-based subscriber area 80 within the system 71, each browser-based subscriber 72 will have access to one of several customized forms that they will complete electronically at their work station and transfer to the database server 90." (*Id.*, col. 5, ll. 12-16).

Further, the specification provides:

> "[t]hese query forms provide each subscriber with access to the database server 32 which, in combination with drop-down lists, select the desired account for access to the database of the data server 32 to retrieve the requested information to the screen of the remote PC." (*Id.*, col. 4, ll. 9-13).

The specification language cited by Plaintiff reveals that processing of the data forms results in billing output while query forms, which query the database server, are transferred to the subscriber's terminal where the subscriber can view and/or print a report. (*Id.*, col. 5, ll. 21-30).

The specification adequately discloses the algorithm or process by which the computer system performs the stated function. Accordingly, the structure is the computer system programmed

to transfer query forms from the PC type computer (38, 106) to the database server (32, 90), to the

subscriber area (28, 80) to the subscriber PC (12, 72), then to return the completed forms, from the

subscriber PC to the subscriber area, to the database server where the desired information is accessed

and, finally, to return the accessed information to the subscriber area, then to the subscriber PC.


**DONE AND ORDERED** at Tampa, Florida, on this _1st_ day of February, 2006.


_____

**JAMES D. WHITTEMORE**
**United States District Judge**


Copies to:  Counsel of Record