UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BILLINGNETWORK.COM, INC.,

        **Plaintiff,**

vs.                          **Case #: 8:04-CV-1515-T-27MAP**

CERNER PHYSICIAN PRACTICE, INC.
and VITAL WORKS, INC.,

        **Defendants.**
_____/

## ORDER

    **BEFORE THE COURT** are Defendants' Amended Motion for Summary Judgment (Dkt. 127), Plaintiff's Brief in Opposition (Dkt. 130), Plaintiff's Motion for Partial Summary Judgment of Infringement (Dkt. 128), Defendants' Response in Opposition (Dkt. 133), Defendants' Motion to Strike Portions of Richard Krumholz's Declaration (Dkt. 116) and Plaintiff's Brief in Opposition (Dkt. 124). The Court held a hearing on the Motions on October 17, 2006. After careful consideration of the briefs, exhibits filed and arguments by counsel, Defendants' Amended Motion for Summary Judgment (Dkt. 127) is **GRANTED IN PART AND DENIED IN PART**, Plaintiff's Motion for Partial Summary Judgment (Dkt. 128) is **DENIED,** and Defendants' Motion to Strike Portions of Richard Krumholz's Declaration (Dkt. 116) is **DENIED AS MOOT**.

## I. Background

    Plaintiff is the assignee of U.S. Patent No. 6,374,229 (the "'229 Patent") entitled "Integrated Internet Facilitated Billing, Data Processing and Communication System." (Am. Compl. at ¶8). Plaintiff's patented system encompasses an internet based billing system in which subscribers access a database through the internet via either thin client technology and a Citrix® server or via browser-

based forms processing. ('229 patent, col. 1, ll. 8-9, col. 2, ll. 56-58). The patent specification includes figures depicting three embodiments of the system, a "browser-based subscriber system," a "direct access subscriber system," and a "combination system for browser-based and direct access subscribers." (Id. at figs. 1, 2, 3, Dkt. 64 at p. 4). In this action, Plaintiff alleges that Defendants' Application Service Provider version of its Intuition PM system (the "Accused System") infringes Claim 1 of its '229 patent which describes BillingNetwork's "browser-based" electronic billing system. (Dkt. 25 at ¶10, Dkt. 128 at p. 4). Claim 1 is the only Claim at issue.[1] Claim 1 reads as follows:

> 1.   An integrated internet facilitated billing, data processing, and communication system comprising:
>
>> a database server and a home page of a website which provides access via an internet service provider (ISP) to said database server by a plurality of browser-based subscribers each of which have electronic access to said home page via a modem and the ISP;
>>
>> said home page providing only secure access by each browser-based subscriber to one of a plurality of subscriber areas within said system;
>>
>> means for providing electronic transfer of substantially only billing and data entry forms to the browser-based subscriber upon request, data entered on said forms, when electronically returned to a corresponding said subscriber area, then entered into said database server, said database server then, utilizing an appropriate application software thereon, producing billing invoices and statements to clients and customers for each corresponding browser-based subscriber;
>>
>> means for providing real time electronic viewing and query access of data and billings stored in said database server by each corresponding browser-based subscriber;
>>
>> a PC type computer electronically connected to said database server for controlling said forms as required and responding to queries entered by each browser-based subscriber.

On February 2, 2006, the Court construed the claims of the '229 patent in its *Markman* Order.

---

[1] The Court granted Defendants' Motion to Strike references to Claims 6 and 7. (See Dkt. 81).

(Dkt. 97, *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)).  The parties now move for summary judgment, respectively, claiming no genuine issues of material fact exist with respect to the presence of the individual claim limitations, as construed by the Court, in the Accused System.  Defendants also argue that they are entitled to summary judgment on their counterclaim of invalidity.

The Court will address Defendants' Motion for Summary Judgment first, as it is dispositive of the infringement issue.

## II. Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (internal citations omitted).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  *Id.* at 1260.  All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).  In a patent case, when the non-moving party will bear the burden of proof at trial, the moving party discharges its burden at the summary judgment stage by "stating that the patentee [has] no evidence of infringement and pointing to the specific ways in which accused systems [do] not meet claim limitations."  *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006).

3

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *Id.*; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable fact finder could find for the non-moving party. *Id.*

### III. Infringement

In a patent infringement case, claim construction, a question of law, is the first step in a non-infringement analysis. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999). The second step, whether the construed claims read on the accused device, is a question of fact. *Id.* Although the second step is a question of fact, "it is amenable to summary judgment where, *inter alia,* no reasonable fact finder could find infringement." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1315 (Fed. Cir. 1998) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem., Co.,* 520 U.S. 17, 39 n.8 (1997) ("[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obligated to grant partial or complete summary judgment"). However, because "infringement is itself a fact issue, a district court must approach a motion for summary judgment of infringement or non-infringement with a care proportioned to the likelihood of its being inappropriate." *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116 (Fed. Cir. 1985).

4

"Literal infringement requires that the accused device embody every element of the claim." *Builders Concrete, Inc. v. Bremerton Concrete Prod. Co.*, 757 F.2d 255, 257 (Fed. Cir. 1985). Thus, summary judgment is appropriate if there exists no genuine issue of material fact such that a reasonable fact finder could not find that *every* limitation in the claim is found in the accused device. *See PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005); *see also Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1299 (Fed. Cir. 2004). "To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims. If even one limitation is missing or not met as claimed, there is no literal infringement." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1350 (Fed. Cir. 1999).

Infringement under the doctrine of equivalents "requires a showing that the difference between the claimed invention and the accused product or method [is] insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method." *Aquatex Indus., Inc. v. Techniche Solutions*, 2007 WL 582392, at *4 (Fed. Cir. Feb. 27, 2007). "[T]he doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co.*, 520 U.S. at 29.

### A. Browser-Based Subscribers

The phrase "browser-based subscriber" appears six times throughout Claim 1 of the '229 patent. The Court construed the phrase to mean "a person who pays for access to a service that allows the user to access, view, and enter remotely-stored data *utilizing a software application that locates and displays web pages*." (Dkt. 97) (emphasis added). The Court explained in its *Markman* Order that the difference between the browser-based and direct access subscribers as described in

5

the '229 patent is *what* the subscriber utilizes in order to gain access to the desired data and forms and that the construction of "browser-based subscriber" should take into account this distinction. (Id. at p. 10).[2]  The browser-based subscribers utilize an internet service provider and a web site, while the direct access subscribers utilize an internet service provider and a direct access server (Citrix®).[3]  (Dkt. 97).

## 1. Literal Infringement

Defendants assert that users of the Accused System do not utilize a software application that locates and displays web pages to view or enter remotely stored data and therefore Plaintiff cannot establish literal infringement.  Plaintiff responds that users of the Accused System utilize a browser to access the system, and therefore Plaintiff can establish that the browser-based subscriber limitation reads on the Accused System.  The Court finds that, even when viewing the evidence in a light most favorable to Plaintiff, no genuine issue of material fact exists with respect to the presence of this limitation in the Accused System.  While Plaintiff has presented evidence that could lead a fact finder to conclude that users of the Accused System utilize a browser to access the system,  Plaintiff has not presented evidence that could lead a fact finder to conclude that users of the Accused System utilize a browser to access, view *and* enter remotely-stored data.

Defendants' expert, James Whicker, testified that he did not need a browser to access the

---

[2] Independent Claim 6 of the '229 patent also describes direct access subscribers accessing the direct access server via a modem and an internet service provider.  ('229 patent, col. 6, l. 65- col. 7, l. 2).

[3] The '229 patent specification supports the requirement that browser-based subscribers utilize a browser specifically to enter data.  (See '229 patent, col. 2, ll. 56-58) ("[s]ubscribers will access the database through the internet via *either* thin client technology and the Citrix® server *or via browser-based forms processing*") (emphasis added).  In contrast, when referring to direct access subscribers, the specification states that "[t]he subscriber will have instantaneous access to the data and enter data *directly into* secure subscriber data sets." (Id., col. 3, ll. 10-11).  The thin client technology and the Citrix® server are the hallmarks of the "direct access" system not at issue here.  (See col. 1, l. 66-col. 2, l. 14, col. 3, ll. 4-11; col. 4, ll. 37-41).

Accused System. (Whicker depo. at p. 39). Whicker opines that in the Accused System the browser "is used only for the purpose of downloading a payload that installs a Citrix client on the users' desktop PC. Once this is completed, the browser is no longer needed or used." (Whicker Rep. at p. 10,[4] see also Whicker depo. at pp. 92-93, 97, Brown depo. at pp. 44-46). In contrast, Plaintiff's expert, Jerrold Shames, testified that he *did* need a browser to enter the Accused System. (Shames depo. at pp. 91-92, 98). Shames testified that you cannot initiate the Citrix connection in the Accused System without first going through a browser so that even if the Citrix client was already loaded on the subscriber's PC, a browser would be required to access the data on the database server in the Accused System. (Id. at p. 100). Accordingly, there exists a genuine issue of material fact as to whether a user of the Accused System must utilize a browser to connect to the Accused System in order to access its database.

Nevertheless, Plaintiff has not presented evidence from which a reasonable fact finder could conclude that subscribers of the Accused System utilize a browser, a software application that locates and displays web pages, to view and enter data in the Accused System. Notably, Plaintiff's argument in its brief and during oral argument focused on the use of a browser to access the system in general but not on the use of a browser to specifically enter data. (Dkt. 130 at p. 4, Hrg. trans. at pp. 21-23).

Plaintiff relies on several documents to support its contention that Defendants admitted that the Accused System is "*accessed*" by browser-based subscribers. (See Dkt. 130 at p. 4) (emphasis added). The documents relied on by Plaintiff, while probative of the issue of whether or not a browser is used to access the Accused System in general, are not probative of whether a browser is

---

[4] Defendants submitted the Declaration of Whicker which states that his expert reports accurately and completely set forth his opinions regarding noninfringement and invalidity. (See Dkt. 127 at Ex. C).

utilized to view and enter data once the system is accessed. None of the evidence presented by Plaintiff establishes a "linkage" between the use of a browser in the Accused System and the viewing or entry of remotely stored data. *See Charles E. Hill & Assoc., Inc. v. CompuServe, Inc.*, 33 F. App'x 527, 533 (Fed. Cir. 2002).

First, Plaintiff cites to a letter from Defendant Vital Works, Inc. to Richard Krumholz, co-inventor of Plaintiff's patented system, advising Krumholz that with the Accused System, he will enjoy "[t]he choice of ASP or practice-based software delivery."[5] (Dkt. 128 at Ex. 4). Plaintiff's expert, Shames, testified generally that "ASP" stands for Application Service Provider which is "the location of application infrastructure that is remotely accessible by subscribers . . . [i]t allows people to exercise application environments without having that application environment locally executing. It's a remote execution." (Shames depo. at p. 63). Shames's definition of ASP does not support a conclusion that the mention of ASP indicates that a browser is necessary for the entry of data. To the contrary, the '229 patent specification indicates that the direct access system is similarly remotely accessed by the subscriber. (See '229 patent, col. 2, ll. 7-14).

Further, Plaintiff cites to Kyra Brown's deposition,[6] in which she testified that Application Service Providers ("ASP") "remotely host applications that are typically *accessed* by end users in a browser-based format via the internet." (Brown depo. at p. 93) (emphasis added). Regardless of

---

[5] According to Krumholz, he received a solicitation letter directed to his medical practice from Defendants offering a demonstration of the Accused System. Krumholz accepted the solicitation and received a demonstration. (Krumholz depo. at pp. 191-92).

[6] Kyra Brown is the Solution Marketing Manager for Cerner Physician Practice, Inc. and was formerly employed by Vital Works, Inc. prior to Cerner's acquisition of a portion of Vital Works. (Brown Dec. at ¶1).

its context,[7] this testimony does not address the use of a browser to view or enter data. Rather, it speaks only to accessing the application. Further, there is no indication that Brown's use of the phrase "browser-based format" considered the Court's construction of the phrase "browser-based subscriber." Her statement that ASPs remotely host applications that are typically accessed by end users in a browser-based format therefore is no different than a statement that ASP applications are typically accessed by end users in a browser-based format "as I define the term."[8] *See Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1047 (Fed. Cir. 2000). Plaintiff has submitted no evidence suggesting that the "choice of ASP or practice-based software delivery" implicates the need for a browser when entering data in the accused system.

Defendants' "ASP Hosted Hardware Specifications" document lists Microsoft Internet Explorer 5.0 and "Citrix ICA ActiveX Client *for Web Browsers*" as required software for the Accused System. (Dkt. 128 at Ex. 7, CRNC 2558) (emphasis added). Brown testified that Microsoft Internet Explorer is a standard part of the Microsoft Windows 2000 operating system. (Brown depo. at p. 41). She testified that "for Web Browsers" with respect to the Citrix ICA ActiveX Client means that the Citrix version referred to is installed on the client's machine using a web browser. (Id. at pp. 44-45). Plaintiff has presented no evidence to support a conclusion that the "for web browsers"

---

[7] Brown's testimony addressed her understanding of "ASP" in the context of questions from Plaintiff's counsel regarding Defendants' predecessor's prospectus which indicated an intention to develop software applications that could be delivered through an ASP, not specifically with respect to the Accused System. (Brown depo. at pp. 90-92); *see Charles E. Hill & Assoc., Inc.*, 33 F. App'x. at 533.

[8] Brown's declaration states that "[s]ome other application service providers ("ASPs") remotely host applications that are accessed by end users in a browser-based format via the Internet. Intuition PM, however, is not accessed by end users in a browser-based format via the Internet. Instead, Intuition PM is accessed via a Citrix client." (Brown Dec. at ¶4). Plaintiff argues that the Court is entitled to disregard the declaration because it conflicts with Brown's deposition testimony. However, the Court need not rely on Brown's declaration in making its determination as Brown's deposition testimony itself does not provide the evidence that Plaintiff needs.

reference indicates that a browser is utilized to enter data in the Accused System.

Krumholz testified that an employee of Defendants stated that the Accused System was "browser-based." (Krumholz depo. at pp. 200-201). Specifically, Krumholz asked the employee how a user got to the user name and password and he said "[t]hrough a URL." (Id). Krumholz's testimony regarding Defendants' employee's statement is not probative as to whether the Accused System includes "browser-based subscribers" as there is no indication that the employee knew of the Court's definition of "browser-based subscriber." *See Collins, Inc.,* 216 F.3d at 1047 ("that assertion is thus no different from a statement that" the Accused System is browser-based "as I define the term"). In fact, the testimony indicates that the use of a URL to get to a user name and password was the basis of the "browser-based" reference, not the continued use of a browser to view and enter data. Again, this evidence does not speak to the requirement that the browser be utilized to view and enter data once in the system.

Finally, Plaintiff contends that Defendants' document CRNC 002999, a page from "VitalWorks Intuition PM Reports Guide August 2003," which provides that a user of the Accused System can pull the Help menu to "[a]ccess Intuition PM browser-based online help," demonstrates that Defendants admitted that the Accused Product is accessed by browser-based subscribers. (Dkt. 130 at p. 4, Dkt. 128 at Ex. 6). Shames also testified that a browser is a "necessary component" of the Accused System because a customer was told that the browser had to be re-installed and restarted for him to be able to print off reports. (Shames depo. at pp. 108, 109-112, CRNC 1906). The question is not whether a browser can or must be used to print off reports or gain customer service

assistance but whether a browser is utilized when viewing and entering data into the system.[9]

As Plaintiff noted during oral argument, Shames did testify that the browser was "up and running" when he was presented with screens on which to enter data in the Accused System. (Shames depo. at pp. 92- 93). This testimony does not allow for a reasonable inference that the browser was *utilized* or even *necessary* when entering data, however. To the contrary, Shames expressly testified that he did *not* use the browser when entering data. (Id. at pp. 99-100). He testified that the screens on the Accused System on which he could enter data were not web pages. (Id. at p. 97). Rather, they were "application pages being executed through the Citrix connection to your local – to your local computer from the remote ASP site."[10] (Id. at p. 97).

Shames opined that if a user uses the internet and an ISP, that user would be a browser-based subscriber. (Shames depo. at pp. 102-03). "[O]nce you establish yourself as being browser-based even though you use Citrix as a communications protocol, the fact that you came in as a browser-based subscriber classifies you as such." (Id. at p. 106). According to Shames, the fact that the subscriber uses a browser *at all* renders that subscriber "browser-based" despite the fact that the subscriber uses Citrix to view and enter data. (Id.)

Shames's opinion conflicts with the Court's construction of the phrase "browser-based subscriber" and the Court's explanation of how it arrived at that construction, which was in large part based on the difference between the browser-based and direct access embodiments described in the '229 patent specification. (See Dkt. 97). Further, Defendants' witnesses testified that the only time

---

[9] The Court notes that Plaintiff cited to the same evidence in its Motion for Partial Summary Judgment to support its assertion that Defendants' system encompasses the "browser-based subscriber" limitation. (See Dkt. 128).

[10] Shames also testified that he does not know whether Citrix "can locate or display web pages." (Shames depo. at p. 100).

a browser is used in the Accused System is when a user needs to download the Citrix client onto their personal computer. (Whicker depo. at pp. 92-93, 97, Brown depo. at pp. 44-46).

In light of the above, Plaintiff's reliance on the numerous references to "ASP" and "browser" do not provide evidence from which a reasonable fact finder could infer that the browser-based *subscriber limitation as construed by the Court reads on the Accused System*. Specifically, Plaintiff has pointed to no evidence from which a reasonable fact finder could conclude that users of the Accused System utilize a software application that locates and displays web pages to access, view, *and* enter remotely-stored data as opposed to simply access the system itself. In contrast, Plaintiff's own expert affirmatively testified that a browser is not used when entering data in the Accused System. Accordingly, the Court concludes that Plaintiff cannot establish literal infringement of Claim 1 because the Accused System does not contain this claim limitation. *See WMS Gaming, Inc.,* 184 F.3d at 1350 (if even one limitation is missing as claimed, there is no literal infringement).

### 2. Infringement under the Doctrine of Equivalents

Likewise, Plaintiff cannot establish the presence of the "browser-based subscriber" limitation on the Accused System under the doctrine of equivalents. The difference between a subscriber who utilizes a browser to view and enter data and a subscriber who utilizes Citrix to view and enter data cannot be said to be insubstantial, in light of the Court's construction.[11] Further, the doctrine of equivalents cannot be applied so that it effectively eviscerates a claim in its entirety. *Warner-Jenkinson Co.,* 520 U.S. at 29; *Freedman Seating Co. v. Am. Seating Co.,* 420 F.3d 1350, 1358 (Fed. Cir. 2005). Thus, an element of the Accused System cannot be an equivalent, as a matter of law, to

---

[11] Plaintiff has not cited to and the Court has not located any opinion by Shames that people skilled in the art would find the use of Citrix, rather than a browser, to view and enter data an insubstantial difference. *See e.g. Overhead Door Corp. v. the Chamberlain Group, Inc.,* 194 F.3d 1261, 1269-70 (Fed. Cir. 1999).

a '229 claim limitation if such a finding would effectively eviscerate that limitation. *See id.* To make such a determination, "courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Id.* at 1359.

Here, Shames, Plaintiff's expert, opines that using a browser to access a system in general qualifies one as "browser-based." (Shames depo. at p. 106). However, the '229 patent specification distinguishes between the manner in which browser-based and direct access subscribers access and enter information in the database. As construed by this Court, "[t]he browser-based subscriber utilizes an internet service provider and a web site while the direct access subscribers utilize an internet service provider and Citrix®." (Dkt. 97 at p. 10). Consistent with this Court's claim construction, a "browser-based subscriber" is accordingly one who utilizes a browser when accessing, viewing and entering data, rather than Citrix. Given this distinction, an individual who accesses the Accused System with a browser but utilizes Citrix when entering data cannot be the "equivalent" of a "browser-based subscriber" in the '229 system. A contrary finding would effectively eviscerate the "browser-based subscriber" claim limitation construed by the Court. *See Planet Bingo, LLC v. Gametech Int'l, Inc.,* 472 F.3d 1338, 1341-45 (Fed. Cir. 2006).

In sum, even when viewing the evidence in a light most favorable to Plaintiff, Plaintiff has failed to point to any evidence that could lead a reasonable fact finder to conclude that the browser-based subscriber limitation reads on the Accused System either literally or under the doctrine of equivalents. Because the Court concludes that no genuine issue of material fact exists with respect to the presence of the "browser-based subscriber" limitation in the Accused System, the Court finds as a matter of law that the Accused System does not infringe Claim 1 of the '229 patent.

B. Means-Plus-Function Limitations

Plaintiff has failed to present sufficient evidence to establish the existence of a genuine issue of material fact with respect to whether the means-plus-function limitations read on the Accused System, which further supports the Court's finding of non-infringement.

1. Literal Infringement

For a means-plus-function limitation to read literally on an accused device, the accused device must "employ means identical to or the equivalent of the structures, material, or acts described in the patent specification" and must "perform the identical function as specified in the claims." *WMS Gaming,* 184 F.3d at 1347; 35 U.S.C. § 112, ¶6.

The Court construed two means-plus-function limitations in Claim 1 in its *Markman* Order. (Dkt. 97).  The Court construed the "means for providing electronic transfer" limitation to include the function of "providing electronic transfer of substantially only billing and data entry forms to the browser-based subscriber upon request, data entered on said forms, when electronically returned to a corresponding said subscriber area, then entered into said database server." (Dkt. 97 at p. 30).  The structure performing the function was construed to be the "computer system programmed to transfer data forms from the PC type computer (38, 106) to the database server (32, 90), to the subscriber area (28, 80), to the subscriber PC (12, 72), then to return the completed forms from the subscriber PC to the subscriber area and back to the database server."  (Id. at p. 33).

The "means for providing real time electronic viewing" limitation was construed to include the function of "providing instantaneous electronic viewing and query access of both data and billings stored in the database server by each corresponding browser-based subscriber."  (Id. at p.

14

35). The structure performing the function was construed to be "the computer system programmed to transfer query forms from the PC type computer (38, 106) to the database server (32, 90), to the subscriber area (28, 80) to the subscriber PC (12, 72), then to return the completed forms, from the subscriber PC to the subscriber area, to the database server where the desired information is accessed and, finally, to return the accessed information to the subscriber area, then to the subscriber PC." (Id. at pp. 35-36).

### a. Function

With respect to the first limitation, Defendants argue that Plaintiff cannot establish that the identical function is performed in the Accused System because the Accused System does not transfer forms as is required and no forms reside on the same device on which the database resides in the Accused System. The Court finds that Plaintiff has presented sufficient evidence to create a genuine issue of material fact with respect to these issues. (See Shames depo. at p. 81(describing forms as a set of instructions), Shames Exp. Rep. 1/31/06 at ¶16 (stating that forms for entering data were presented), Shames depo. at pp. 81, 85 (stating forms are associated with the database server), Shames Supp. Rep. at ¶17 (stating that the accused product includes a "database tool set" for creating forms and the database tool set is part of the database server), Shames depo. at pp. 37-38 (one schooled in the art would know that a "device" may be either hardware or software").

Shames opines that the Accused System includes both the "means for providing electronic transfer" and the "means for providing real time electronic viewing" limitations. (Shames Exp. Rep. 1/31/06 at ¶¶16, 17). He states generally that the means for providing electronic transfer limitation was demonstrated in his examination of the Accused System, where forms for entering claim data were presented and the data was transmitted to a database server. (Id). "Thus, the cycle of claim

entry, payment entry, and statement production was completed."[12]  (Id).  Krumholz states in his

declaration that during a demonstration of the Accused System, he "accessed the accused product

from a client computer and electronically transferred a claims form to the client computer," data was

entered onto client forms which were electronically returned to a subscriber area and entered into a

database server. (Krumholz Dec. at ¶¶10-11).  Krumholz also states that during a demonstration of

the Accused System, a Cerner employee had to reset the password from a remote location, indicating

the system included a PC type computer for controlling forms and responding to queries.  (Id. at

¶17).

    Shames also opines that the Accused System includes the means for providing real time

electronic viewing "because the examination allowed for entry of data that was retrievable upon the

exit of the data entry screens."  (Shames Exp. Rep. 1/31/06 at ¶17).  "This was demonstrable by

using the screen reporting capabilities to view the data in a number of forms, for example, by patient,

by provider, and by date.  Each of these selections proves that the system uses a query type access

to retrieve the data in a specifically requested sequence."  (Id).  Krumholz, in his declaration, states

that "[s]ince the data and billings were entered on a real time basis, the data and billings were

available for real time electronic viewing and query access."  (Dkt. 108 at ¶14).

    Notwithstanding that this evidence would otherwise create a genuine issue of material fact

as to whether the Accused System performs the identical function, both of the means-plus-function

limitations include the "browser-based subscriber" claim limitation.  As discussed, Plaintiff has not

---

[12] Shames also opined that the Accused System includes a PC type computer with respect to the Claim 1
limitation requiring "a PC type computer electronically connected to said database server for controlling said forms as
required and responding to queries entered by each browser-based subscriber" or an equivalent thereof because a
database server must be controlled by a PC type computer or an equivalent thereof.  "Since I can establish that
Defendants' system included a database server ... I conclude that Defendants' system also includes a database server
[sic]."  (Shames Exp. Rep. 1/31/06 at ¶18, see also Shames depo. at pp. 146-148).

presented evidence from which a reasonable fact finder could conclude that users of the Accused System utilize a software application that locates and displays web pages to access, view, and enter remotely-stored data. Accordingly, because Plaintiff cannot establish that the Accused System meets the browser-based subscriber limitation, Plaintiff cannot establish that the Accused System performs the identical function of either means-plus-function limitation.

b. Structure

Even if Plaintiff were able to establish the existence of a genuine issue of material fact with respect to the functional requirement, Plaintiff has not presented sufficient evidence to create an issue of material fact with respect to the structural requirement.

In Shames's supplemental report, provided subsequent to the Court's claim construction Order, he states generally, with respect to the means for providing electronic transfer limitation, that "[m]y report indicated that the accused product includes a structure that performs this function or an equivalent thereof. I stand by my analysis." (Shames Supp. Rep. 3/29/06 at ¶54). Shames never opines, however, that the Accused System contains the structure, or algorithm, as it was construed by the Court. Specifically, Shames does not opine that the Accused System includes a computer system programmed to transfer data forms from a PC type computer to a database server, to a subscriber area, to a subscriber PC, and then to return the completed forms from the subscriber PC to the subscriber area and on to the database server or an equivalent thereof.

Rather, Shames testified that the structure is the "overall product itself," or the pieces of the overall product. (Shames depo. at p. 128). When asked what the pieces of the Accused System were that performed the function, Shames responded, "[t]he software that is nominally called the application system itself, the database which is the database, the communications protocol, the

17

internet, the browser, the – you know, all the elements that make up the environment that your system runs in and is composed of." (Id. at p. 129). Shames goes on to contend that if he had been provided the documents that he had requested of Defendants, he would be able to "enumerate the pieces with specificity" but he could "not tell [] with specificity what those elements are."[13] (Id. at p. 130). Nevertheless, Shames testified that in his opinion, it would not matter what the structure that performed the function was. (Id). In his opinion, if the Accused System performs the function, the means-plus-function limitation would be met regardless of the structure that performs the function. (Id).

Similarly, with respect to the means for providing real time electronic viewing, Shames did not perform a structural analysis of the Accused System. In his supplemental report, he states generally that "[m]y report indicated that the accused product includes a structure that performs this function or an equivalent thereof. I stand by my analysis." (Shames Supp. Rep. 3/29/06 at ¶64). This unsupported conclusion does not create a genuine issue of material fact. Again, Shames never opines that the Accused System contains the structure, or algorithm, as construed by the Court.

Specifically, Shames does not opine that the Accused System contains a computer system programmed to transfer query forms from a PC type computer to a database server, to a subscriber area to the subscriber PC, then to return the completed forms, from the subscriber PC to the subscriber area, to the database server and, finally, to return the accessed information to the subscriber area, then to the subscriber PC. Rather, Shames testified that the structure "includes all of the fundamental elements of the Accused System, including the software application code, the database, the communications infrastructure, the browser, the internet." (Shames depo. at pp.144-

---

[13] Plaintiff points to no unresolved discovery issues in this regard.

45). He stated that, "[a]gain, all of the elements that I base my experience-based information tells me, not having had a diagram of the systemic picture as to what those elements actually are." (Id). As noted, Shames testified that he could not tell specifically what the elements were because he was not provided documentation in order to do that, and that in his opinion, it would not matter what the structure that performed the function was because if the Accused System performs the function, the means-plus-function limitation would be met regardless of the structure that performs the function. (Id. at p. 145).

Plaintiff does not argue that Shames's overall testimony establishes that he did, in fact, perform a structural comparison. Rather, Plaintiff argues that its functional analysis is sufficient and that it does not have to perform a structure to structure analysis in light of *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1351 (Fed. Cir. 1999).[14]   The court in *WMS Gaming* expressly stated, however, that in order to establish literal infringement, the patentee must establish that the "accused device employs structure identical or equivalent to the structure disclosed in the patent *and* that the accused device performs the identical function specified in the claim." *Id.* at 1350 (emphasis added). "Because a means-plus-function limitation does not recite sufficient structure to perform the function in the claim itself, the infringement analysis requires a comparison of the accused device to the corresponding structure described in the specification." *Tritek Techs., Inc. v. U.S.*, 67 Fed. Cl. 735, 749 (2005). "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of

---

[14] Plaintiff similarly fails to discuss the specific algorithm construed by the Court in its Motion for Partial Summary Judgment of Infringement. (See Dkt. 128 at p.14).

claimed function for that structure." *Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1369 (Fed. Cir. 2004)(quoting *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987)(additional citations omitted). Despite these authorities, Plaintiff essentially argues that when a computer implemented algorithm is the structure in a means-plus-function limitation, no structural analysis is necessary.

*WMS Gaming* involved a computer implemented algorithm in a gambling device. 184 F.3d at 1343, 1349. The court reversed the lower court's holding of literal infringement and affirmed its holding of infringement under the doctrine of equivalents. *Id.* at 1354. The court found that although there was equivalent structure in the accused system, there was no identical function. *Id.* at 1352. Since the structure was found to be limited by the disclosed algorithm, the court reasoned that its analysis of structural equivalence "necessarily discusses the disclosed algorithm, which includes functional-type elements." *Id.* at 1351. The court did not, however, find that a functional analysis obviated the need for a structural analysis. Rather, in comparing the means-plus-function claims with the accused device, the court clearly reviewed the lower court's functional analysis as well as its structural analysis. *Id.* at 1352.[15]

### (1) Identical Structure

Here, while the Court's construction of the structure in the means-plus-function limitations necessarily includes functional-type elements, the structure is not identical to the function in either

---

[15] Further, in *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005), the court noted that the algorithm in *WMS Gaming* "resembled" the functional language but rejected an argument that the *WMS Gaming* Court's construction of the structure "was merely a restatement of the function . . . ." The Court stated, "[w]e do not read *WMS Gaming* to be so limited. The *WMS Gaming* court could have relied on the function to limit the claim, but explicitly based the claim construction portion of its ruling on structure instead. A computer implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, and the corresponding structure is the algorithm." *Harris Corp.*, 417 F.3d at 1253 (citations omitted).

limitation. (See Dkt. 97). Accordingly, a functional analysis alone is insufficient, contrary to Plaintiff's assertion. Like the plaintiff in *McKesson Info. Solutions LLC v. Trizetto Group, Inc.*, 426 F. Supp. 2d 197, 202-03 (D. Del. 2006), Plaintiff's expert has not performed a structural analysis of the Accused System by comparing either algorithm construed by the Court to the Accused System. Rather, Shames acknowledges that he cannot do so and contends that in any event, he does not believe such a comparison is necessary. Accordingly, Plaintiff cannot establish literal infringement of the means-plus-function limitations because Plaintiff cannot establish identical structure in the Accused System. *See WMS Gaming*, 184 F.3d at 1350 (no identical structure where the microprocessor in the accused system was "programmed differently" than the microprocessor in plaintiff's patented device).

(2) Equivalent Structure

The next question is whether the Accused System contains equivalent structure. "The proper test for determining whether the structure in an accused device is equivalent to the structure recited in a section 112, ¶6, claim is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial." *WMS Gaming,* 184 F.3d at 1351 (citing *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus. Inc.*, 145 F.3d 1303, 1309 (Fed. Cir. 1998) and *Alpex Computer Corp. v. Nintendo Co.,* 102 F.3d 1214, 1222 (Fed. Cir. 1996)). "*Once the relevant structure in the accused device has been identified*, a party may prove it is equivalent to the disclosed structure by showing that the two perform the identical function in substantially the same way, with substantially the same result." *Applied Med. Res. Corp. v. U.S. Surgical Corp.,* 448 F.3d 1324, 1333 (Fed. Cir. 2006) (citing *Kemco Sales, Inc. v. Control Papers Co.,* 208 F.3d 1352, 1364 (Fed. Cir. 2000)) (emphasis added).

21

Here, Plaintiff's expert has not discussed an algorithm in the Accused System that performs the construed function of the means for providing electronic transfer or the means for providing real time electronic viewing.  Having not identified the relevant structure, Plaintiff cannot establish a genuine issue of material fact with respect to the existence of a structural equivalent in the Accused System.  Specifically, there exists no factual dispute regarding whether the Accused System performs the identical function in substantially the same way because Plaintiff has not brought forth any evidence with respect to the structural algorithm in the Accused System that performs the asserted function.  Further, there is not sufficient evidence from which a reasonable fact finder could conclude that the structural differences in the Accused System are insubstantial because Plaintiff has not identified how, specifically, the Accused System performs the asserted functions.

### 2. Infringement under the Doctrine of Equivalents

Finally, the Court must determine whether Plaintiff has presented evidence from which a reasonable fact finder could find that the means-plus-function limitations read on the Accused System under the doctrine of equivalents.  While an equivalent structure under § 112, ¶6 "informs the claim meaning for a literal infringement analysis," the doctrine of equivalents, on the other hand, "extends enforcement of claim terms beyond their literal reach" in the event of equivalence.  *Al-Site Corp.,* 174 F.3d at 1320 (citing *Warner-Jenkinson,* 520 U.S. at 21).  Both "protect the substance of a patentee's right to exclude by preventing mere colorable differences or slight improvements from escaping infringement, the former by incorporating equivalents of disclosed structures into the literal scope of a functional claim limitation, and the latter, by holding as infringements equivalents that

22

are beyond the literal scope of the claim."[16] *WMS Gaming*, 184 F.3d at 1353 (quoting *Chiuminatta Concrete Concepts,* 145 F.3d at 1310). Further, "under § 112, ¶ 6, the accused device must perform the identical function as recited in the claim element while the doctrine of equivalents may be satisfied when the function performed by the accused device is only substantially the same." *Al-Site Corp.*, 174 F.3d at 1320 (citing *Cybor Corp. v. FAS Tech., Inc,* 138 F.3d 1448, 1456 (Fed. Cir. 1998) and *Hughes Aircraft Co. v. U.S.,* 140 F.3d 1470, 1475 (Fed. Cir. 1998)).

Plaintiff relies on *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371 (Fed. Cir. 2002) to support its claim that "infringement under the doctrine of equivalents can be shown through a functional analysis." (Dkt. 130 at p. 12). In *Interactive*, the absence of literal infringement of a means-plus-function limitation was due to a lack of identical function, not a lack of structure, and thus infringement under the doctrine of equivalents was not necessarily precluded because "infringement under the doctrine of equivalents may be premised on the accused and the patented component having substantially the same function . . . ." *Id.* at 1382.

This Court's finding of no literal infringement is based on the lack of identical function due to the absence of the browser-based subscriber limitation *and* the lack of structural equivalence. Plaintiff's expert failed to identify any algorithm in the Accused System for performing the asserted function. No genuine issue of material fact exists with respect to the presence of an equivalent structure for performing the means for providing electronic transfer limitation or the means for providing electronic viewing limitation in the Accused System under the doctrine of equivalents.

---

[16] One difference between § 112, ¶6 and the doctrine of equivalents involves timing. *Al-Site Corp.*, 174 F.3d at 1320. A structural equivalent under § 112 must have been available at the time of the issuance of the claim "because the literal meaning of a claim is fixed upon its issuance," whereas an "after arising equivalent infringes, if at all, under the doctrine of equivalents." *Id.*

*See Chiuminatta*, 145 F.3d at 1310 ("[a] finding of a lack of literal infringement for lack of equivalent structure under a means-plus-function limitation may preclude a finding of equivalence under the doctrine of equivalents"); *see also Al-Site Corp.*, 174 F.3d at 1321. Further, because no genuine issue of material fact exists with respect to the presence of an equivalent of the browser-based subscriber limitation, as discussed above in the browser-based subscriber limitation section, no genuine issue of material fact exists with respect to the presence of an equivalent function in the means-plus-function limitations which both contain the browser-based subscriber limitation.

In sum, Plaintiff's inability to establish that the means-plus-function limitations in Claim 1 read on the Accused System either literally or under the Doctrine of Equivalents further supports the Court's finding of non-infringement.

### 3. Indirect Infringement

Defendants argue that summary judgment of no indirect infringement is also appropriate in light of Plaintiff's admission that it "is unaware of any facts that would support a separate claim under 35 U.S.C. §271(b) [or (c)] at this time." (Pl. Supp. Resp. to Second Interrog., #12). Plaintiff responds that "Defendants are also indirectly infringing the '229 patent by providing the Accused Product to their customers." (Dkt. 130 at p. 20). Plaintiff offers no evidence in support of this assertion. Nevertheless, as Plaintiff's assertion is based on distribution of the Accused System and the Court has found that summary judgment of non-infringement is warranted in favor of Defendants with respect to the Accused System, summary judgment of no indirect infringement is also warranted.

## IV. <u>Validity</u>

Although this Court has found in favor of Defendants on the issue of infringement, Defendants' counterclaim of invalidity must nevertheless be addressed. *See Freedman Seating Co.*, 420 F.3d at 1362-63. A patent is presumed to be valid pursuant to 35 U.S.C. § 282 and, thus, a party asserting invalidity must establish invalidity by clear and convincing evidence. *Apotex U.S.A., Inc. v. Merck & Co., Inc.,* 254 F.3d 1031, 1036 (Fed. Cir. 2001); *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 881 (Fed. Cir. 1998). Clear and convincing evidence exists when the party asserting invalidity "proves in the mind of the trier of fact 'an abiding conviction that the truth of its factual contentions are highly probable'." *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991)(citing *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984))(additional citations omitted). Here, Defendants argue that Plaintiff's '229 patent is invalid as anticipated under 35 U.S.C. § 102 or, in the alternative, as obvious under 35 U.S.C. § 103.[17] The parties will have an opportunity to further brief these issues.

### A. Invalidity Due to Anticipation

Defendants first argue that Claim 1 of the '229 patent is invalid in light of prior art pursuant to 35 U.S.C. § 102(g). This section provides, in part, "[a] person shall be entitled to a patent unless . . . before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g)(2). Section 102(g) ensures that a patent is awarded "to the 'first' inventor in law." *Apotex USA, Inc.*, 254 F.3d

---

[17] Plaintiff argues that Defendants improperly exceeded the page limit by attaching Exhibit U. This issue is moot because the Court is affording the parties an opportunity to supplement their arguments with respect to the validity issue.

at 1035 (citing *New Idea Farm Equip. Corp. v. Sperry Corp.,* 916 F.2d 1561, 1566 (Fed. Cir. 1990)). "A prior art device can anticipate a claimed invention under § 102(g)(2) if it was conceived and reduced to practice prior to the filing date of the patent." *Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). Anticipation under this section requires a single prior art to disclose all of the elements of a claimed invention arranged as in that claim. *Id.* (quoting *Carella v. Starlight Archery & Pro Line Co.,* 804 F.2d 135, 138 (Fed. Cir. 1986)) (additional citations omitted). Accordingly, each and every limitation must be found either expressly or inherently in a single prior art reference. *Celeritas Tech., Ltd., v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998).

Once the initial burden has been met, "the burden of production shifts to the patentee to produce evidence sufficient to create a genuine issue of material fact as to whether the prior inventor has suppressed or concealed the invention." *Apotex USA Inc.,* 254 F.3d at 1038. The "ultimate burden of persuasion remains with the party challenging the validity of the patent" and once the patentee satisfies its burden, the party alleging invalidity must rebut such alleged suppression or concealment with clear and convincing evidence. *Id.* (citing *Innovative Scuba Concepts, Inc. v. Fed. Indus., Inc.*, 26 F.3d 1112, 1115 (Fed. Cir.1994)).

Defendants argue that it is "uncontroverted that the ZirMed system available to the public on September 19, 1999 included each feature of Claim 1."[18] (Dkt. 127 at p.18). Defendants argue

---

[18] The Court notes that while Defendants also state that the P5 patent and the Claimsnet publication "also invalidate Claim 1 under 35 U.S.C. §102," Defendants did not address this contention due to space constraints. (Dkt. 127 at p.19). The parties will have an opportunity to further brief these issues.

that the testimonial evidence provided by Doug Fielding,[19] ZirMed's executive Vice President and Chief Information Officer, with respect to the ZirMed system is corroborated by documents. (Fielding Dec. 9/15/05 at p. 1); *see Rosco, Inc. v. Mirror Lite Co.*, 120 F. App'x 832, 836 (Fed. Cir. 2005)("[t]estimonial evidence of invalidity must be corroborated"); *see also Sandt*, 264 F.3d at 1350-51. In response, Plaintiff does not bring forth evidence of suppression or concealment of the ZirMed system but, rather, argues only that Defendants have failed to meet their burden of providing clear and convincing evidence of a single prior art that reads on each and every limitation found in the '229 patent.

Plaintiff argues, specifically, that Defendants have failed to provide clear and convincing evidence that the ZirMed system encompasses the limitation that "said database server then, utilizing an appropriate application software thereon, producing billing invoices and statements to clients and customers for each corresponding browser-based subscriber."[20] In its *Markman* Order, this Court found that "according to the plain language of the claim, this phrase should be construed to require that the database server produce billing invoices to clients, billing invoices to customers, statements to clients and statements to customers." (See Dkt. 97 at p. 24).

The ZirMed system patent application provides that data entered by a medical healthcare provider is in appropriate form for acceptance by a medical clearinghouse which submits the claim "directly to the *multiple* third party payers," (ZirMed patent app. at p.10)(emphasis added). Further,

---

[19] Fielding's declaration provides, in part, that ZirMed was the nation's first company to offer claims data entry and filing via a web browser and that the first ZirMed medical claim was electronically filed via the internet in September 1999. Fielding's declaration attaches a U.S. provisional patent application for the ZirMed.com medical billing system which was rejected as either anticipated or obvious. (Fielding Dec. 9/15/05 at pp.1-2).

[20] Plaintiff also argues that the ZirMed system does not include the "subscriber area" limitation or the "means for providing electronic transfer" limitation. (Dkt. 130).

Fielding states in his first declaration that "[a]s of September 19, 1999, the ZirMed.com system would also produce and send claims and invoices to payors (e.g. insurance companies)." (Fielding Dec. 9/15/05 at ¶ 10, see also Dkt. 127 at Ex. U, p. 8). Fielding states in his second declaration, however, that the ZirMed system existing on September 19, 1999, did not produce invoices or billing statements to patients, did not produce invoices or billing statements that doctors would send to their patients, and did not have the ability to bill individual patients. (Fielding Dec. 12/9/05 at ¶¶ 9-11).

B. Invalidity due to Obviousness

Defendants further argue that Claim 1 is nevertheless invalid as obvious under 35 U.S.C. § 103. That section provides:

> A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The determination of whether an invention is or is not obvious is a legal conclusion based on underlying factual inquiries including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claims at issue and the prior art; and (4) evaluation of any relevant secondary considerations such as commercial success, long felt need and copying. *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.,* 411 F.3d 1332, 1336 (Fed. Cir. 2005) (citing *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 17 (1966)); *Sandt,* 264 F.3d at 1354.

Preliminarily, the Court notes that Defendants argue that their "evidence regarding the underlying factual issues remains uncontroverted" and, thus, the record is "unchallenged as to any alleged secondary considerations." (Dkt. 127 at p. 20). However, neither party presents any

28

argument with respect to secondary considerations such as whether the '229 patent has been commercially successful, whether the patent did or did not satisfy a long felt need or whether there exists evidence of copying. *See Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1323-24 (Fed. Cir. 2005); *see also Neupak, Inc. v. Ideal Mfg. & Sales Corp.*, 41 F. App'x. 435, 440 (Fed. Cir. 2002)("[w]hen a patentee demonstrates commercial success, . . . it is presumed that the commercial success is due to the patented invention"). In fact, Defendants' entire argument that the '229 patent is invalid as obvious is contained in just one page of argument.

Defendants assert that two prior art systems, the P5 system and the ClaimsNet system, disclose the sending of invoices to patients. The '229 patent application was filed October 20, 1999 and was not reduced to practice prior to that date. (Dkt. 127 at Ex. A, #6(d)). Whicker states that a ClaimsNet SEC and prospectus filing is dated December 11, 1998. (Dkt. 127 at Ex. C2, p.9). Plaintiff argues, however, that Defendants cannot establish that the ClaimsNet system was publicly available before the filing date of the '229 patent and, thus, the ClaimsNet system is not prior art. Plaintiff cites to the 30(b)(6) Deposition of ClaimsNet in which Karl Spurlock testified that he did not recall when in 1999 users were able to process claims by the ClaimsNet system without downloading to his or her computer the Citrix WinFrame Client. (Dkt. 130 at Ex. 5)(emphasis added).

A person having ordinary skill in the art is a hypothetical person reasonably skilled in the applicable art. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). Defendants cite to Whicker's Supplemental Expert Report in which he opines that "it would have been obvious to one of ordinary skill in the art to have performed that function at the time the Billingnetwork patent application was filed." (Dkt. 127 at Ex. C3). Plaintiff offers no evidence to rebut this assertion. Plaintiff does argue,

29

however, that significant differences between the claimed prior art, the P5 system, and the '229 patent exist.

Defendants argue, "[s]ending invoices and statements to patients was well known in the prior art before Billingnetwork filed its application." (Dkt. 127 at p. 20, P5 ('271) patent at col. 10, ll. 46-49, col. 15, ll. 16-22). The P5 system does discuss the forwarding of invoices to patients. The P5 patent specification provides that when an insurer is obligated to pay only a portion of the payment requested in an approved claim, an invoice may be sent from the adjudication system to a patient requesting payment. (Id). Defendants also rely on Whicker's expert report addressing the presence of each claim limitation in the P5 system. (Dkt. 127 at Ex.C2).

Plaintiff responds that the P5 system does not teach or suggest the limitation of a "database server then, utilizing an appropriate application software thereon, producing billing invoices to clients, billing invoices to customers, statements to clients and statements to customers." (Dkt. 130 at p.18, Claim 1 of '229 patent). Plaintiff points to the P5 specification section which indicates that software is executed on an access terminal used by a healthcare provider or patient to access a benefits system and from which health care providers can enter a claim for adjudication, implying that the application software is not located remotely. (Dkt. 127 at Ex. M, col. 8, ll. 25-48, col. 9, ll. 17-21).

When obviousness is alleged to arise from a combination of elements across various references, proof of obviousness must include a suggestion, motivation, or teaching to those skilled in the art to make the combination and a reasonable expectation of success. *Iron Grip Barbell Co.*, 392 F.3d at 1320 (Fed. Cir. 2004); *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339,1354 (Fed. Cir. 2003). Defendants argue that money was the motivation to send

30

invoices to patients as a physician would otherwise potentially not be paid in full. Defendants argue that this motivation is expressly disclosed by the P5 patent and other prior art.

The parties' submissions do not adequately discuss the invalidity issue. Accordingly, Defendants' Motion for Summary Judgment on the issue of invalidity is **DENIED WITHOUT PREJUDICE.** The parties are granted leave to file supplemental briefs limited to the issue of invalidity. Initial brief(s) are not to exceed fifteen (15) pages in length and may be filed on or before **April 30, 2007**. Response brief(s) are due ten (10) days thereafter pursuant to Local Rule 3.01 and are not to exceed ten (10) pages.

## V. Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion to Strike

Because the Court finds that summary judgment of non-infringement must be granted in favor of Defendants, Plaintiff's Motion for Partial Summary Judgment of Infringement (Dkt. 128) must necessarily be **DENIED**.[21]

Further, Defendants asked the Court to strike portions of Krumholz's declaration as well as portions of his deposition testimony filed in support of Plaintiff's Motion for Partial Summary Judgment and cited to by Plaintiff in response to Defendants' Motion for Summary Judgment. (Dkt. 116). Krumholz's declaration does not address the browser-based requirement that a browser be used to access, view and enter remotely stored data. Krumholz's declaration also does not address the algorithm of the means-plus-functions' structures. Accordingly, Defendants' Motion to Strike the Declaration of Krumholz is **DENIED** as moot.

---

[21] The Court notes that Plaintiff never addressed the Court's construction of the claim terms when arguing for partial summary judgment of infringement. (See Dkt. 128).

## VI. Conclusion

In sum, it is

**ORDERED AND ADJUDGED** that Defendants' Amended Motion for Summary Judgment

(Dkt. 127) is **GRANTED IN PART AND DENIED IN PART** as set forth above. Plaintiff's Motion

for Partial Summary Judgment (Dkt. 128) is **DENIED** and Defendants' Motion to Strike the

Declaration of Krumholz (Dkt. 116) is **DENIED** as moot.

**DONE AND ORDERED** in chambers this _20ᵗʰ_ day of March, 2007.


**JAMES D. WHITTEMORE**
**United States District Judge**


Copies to: Counsel of Record